# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-1526

ROBERT BROWN,

*Plaintiff-Appellant,*

*v.*

BARTHOLOMEW CONSOLIDATED
SCHOOL CORPORATION,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 03 C 939—**David F. Hamilton**, *Judge.*

———————

ARGUED NOVEMBER 10, 2005—DECIDED MARCH 29, 2006

———————

Before FLAUM, *Chief Judge*, and RIPPLE and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge.*  The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., requires that states, as a condition of receiving federal funds, provide each disabled child within their school system a free appropriate public education. In this action, the parents of an autistic child, Robert Brown ("Bobby"), were unhappy with the "individualized educational program" ("IEP") that their school district, the Bartholomew Consolidated School

Corporation ("Bartholomew"), proposed for the 2002-2003 school year to address Bobby's autism. Unable to settle their differences through negotiation, the parties proceeded before a state administrative officer, who ruled in favor of Bartholomew. Bobby's parents appealed to the State Board of Special Educational Appeals ("BSEA"), which upheld the hearing officer's determination. The Browns then filed this action in the district court, requesting reversal of the administrative decisions. After hearing new evidence on Bobby's academic progress following the BSEA's decision, the district court affirmed the BSEA. The Browns then filed this appeal. In the meantime, while this appeal has been pending, the Browns enrolled Bobby to a different school district and agreed to a new IEP for Bobby's upcoming school year. As we explain further in the following opinion, this change in circumstances renders Bobby's case moot. We therefore vacate the order of the district court and remand with the direction to dismiss this action on that ground.

# I

# BACKGROUND

## A. Facts

Bobby Brown was born on March 28, 1996, and is currently nine-years old. At age two, he was diagnosed with Autism Spectrum Disorder, a condition that severely impaired the development of his linguistic and social abilities. Bobby's autism qualified him as a "child with a disability" under the IDEA, *see* 20 U.S.C. § 1401(3)(A), and when Bobby was three, the Browns sought free appropriate educational assistance from their local school district, Bartholomew. Bobby was evaluated and determined to be eligible for the district's Early Childhood Special Education

("ECSE"), a developmental preschool program for disabled children. Once a child is designated "disabled" under the IDEA, the Act requires that the child receive an individually tailored instruction program, or IEP, that first is developed and then annually reviewed by a committee, or "IEP Team," composed of parents and educators. *See id.* § 1414(d)(1)(A). Consistent with this statutory directive, Bartholomew convened a case conference on April 9, 1999, to develop an initial IEP for Bobby. The IEP Team recommended that Bobby attend ECSE services three days per week, receive 30-minute sessions of speech/language therapy two times per week, and a 30-minute session of occupational therapy once a week. The Browns agreed.

Subsequently, the Browns began researching alternative educational approaches to treating Bobby's autism. They learned of an approach developed by Dr. Ivar Lovaas known as "discrete trial training," which emphasizes heavy parental involvement, early intervention and treatment in the home and elsewhere in the community, rather than in professional settings. The Browns, without consulting Bartholomew, hired Janet Rumple, who had been trained in a variation of the Lovaas approach known as Applied Behavior Analysis ("ABA"). With the help of Rumple, the Browns began a home-based ABA program for Bobby and hired two additional ABA aides to carry out Bobby's day-to-day instruction with oversight and training from Rumple.

Bartholomew held a second case conference on April 27, 2000, to revise Bobby's IEP in contemplation of the upcoming school year. The committee agreed that Bobby's home-based ABA instruction should substitute for the occupational therapy and fine motor skills services that Bobby was receiving through the school. In an effort to cover the increased cost of the at-home program, the Browns and Bartholomew submitted an Application for Alternative

Services to the Indiana Department of Education ("DOE"), requesting approval of funding of Bobby's ABA program. The application listed Bobby's major behavioral impediments such as fecal smearing, temper tantrums, physical aggression and self-injurious behavior, all of which, it submitted, prevented Bobby from learning in a school environment. The DOE denied the request, noting that Bobby's behavioral difficulties were not, at that point, occurring at school. The DOE encouraged the Browns and Bartholomew to try increasing Bobby's school hours and one-to-one assistance before requesting additional funding.

The case conference reconvened, and Bartholomew proposed a revised IEP that would allow Bobby to attend school accompanied by a full-time, one-to-one aide who would provide necessary assistance and behavioral intervention. The Browns objected to this proposal because the full-time aide recommended by Bartholomew had not been trained in ABA instruction. Instead, the Browns proposed that Bobby receive one-to-one instruction by an ABA-trained educator for eight hours per day, five days a week.

As the 2000-2001 school year went forward, negotiations between Bartholomew and the Browns continued to stall. Bobby was reevaluated by a private child development center, and the evaluation suggested that Bobby's ABA treatment was producing some positive results. Yet, Bartholomew still would not agree to an IEP that included ABA treatment. Typically, when disputes arise over an IEP, they are resolved through the impartial due process procedures prescribed by the IDEA. *See id.* § 1415(f). The Browns filed a request for a due process hearing, but before it got underway, the parties reached a settlement, the terms of which were memorialized in an agreement dated February 20, 2001. The agreement provided for a Monday-Thursday schedule of three hours of one-to-one, at-home ABA

instruction in the morning, three hours of one-to-one ABA instruction at school, followed by two hours of one-to-one ABA instruction after school. On Fridays, Bobby would receive six hours of at-home, one-to-one ABA instruction, and this schedule would continue throughout the summer during which all instruction would take place at Bobby's home. Pursuant to the settlement, Bartholomew entered into service contracts with Rumple and two ABA-trained aides to oversee and assist in Bobby's ABA instruction and to train Bobby's teachers at Smith Elementary School in ABA methods. The terms of the settlement were formalized as Bobby's IEP for the remainder of the 2000-2001 school year and the following summer. Bartholomew also agreed to reimburse the Browns for attorneys' fees, school supplies and the costs incurred in providing private ABA instruction going back to June 2000.

For the month of June 2001, Rumple was unable to maintain the level of hours expected of her due to personal and professional commitments. Interested anyway in shifting Bobby's program to a more speech-centered approach, the Browns retained the services of Dr. Carl Sundberg, a professor at Western Michigan University who specialized in Applied Verbal Behavior ("AVB"), a variant of ABA instruction. Dr. Sundberg's AVB methods emphasized rudimentary conversation skills that are taught through a sequence of twenty-six steps, with each step building on the ones before it. In Dr. Sundberg's view, Bobby would need instruction in these basic conversation skills for his upcoming transition from early childhood education to kindergarten. Dr. Sundberg believed that Bobby had to raise his conversational skill level, as measured under the AVB program, from its current 30% level to 70% before he would be ready to enter kindergarten. The Browns transitioned Bobby from his ABA program to Dr. Sundberg's AVB instruction, and Janet Rumple continued

to oversee the program and arranged training for school personnel and at-home aides. Bobby entered kindergarten at the start of the 2001-2002 school year, attending the program on a half-day basis at Richards Elementary School. All other terms of the parties' settlement agreement remained in place, and Bartholomew continued to pay the salaries of Bobby's in-school ABA aides and Janet Rumple.

The IDEA requires that each "child with a disability" be evaluated at least once every three years to assess the child's status as disabled and to evaluate the child's progress in the school curriculum. *Id.* § 1414(a)(2)(A). When Bobby's three-year reevaluation came due in April 2002, both parties recruited outside specialists to undertake independent evaluations. One of Bartholomew's two specialists, Dr. John Umbreit, was an expert in ABA methods and a professor of special education at the University of Arizona. He observed Bobby in the classroom and at home and interviewed Mrs. Brown and Bobby's teachers. Based on his evaluation, Dr. Umbreit made several recommendations, the most important of which was that Bobby attend a full day of kindergarten class at Richards Elementary, assisted by an instructional aide for most of the school day. In Dr. Umbreit's opinion, Bobby would benefit from learning the necessary functional skills, such as communication, self care and motor abilities, in a classroom setting that involved age-appropriate materials and activities. To the greatest extent possible, according to Dr. Umbreit, Bobby's autism-specific instruction should be embedded within typical activities that were provided to other students in his general education class.

The Browns' experts disagreed. Dr. James Mulick, Professor of Pediatrics and Psychology at the Ohio State University, observed Bobby at home and in school. He concluded that, although both settings were appropriate and beneficial,

Bobby was not ready for full-day kindergarten. Dr. Mulnick recommended that Bobby remain in a half-day program identical to his 2001-2002 IEP that remained in place at the time. According to Dr. Mulnick, a full school day would be detrimental, given that Bobby was unable to carry on a conversation and appeared disengaged in a classroom setting. Instead, the intensive, at-home, one-to-one instruction was necessary to correct Bobby's significant language deficit, which, at the time, placed him near the range of mental retardation.

The parties met in case conference on May 20, 2002. The Browns were accompanied by their attorneys and Dr. Sundberg. Also in attendance was George Van Horn, Bartholomew's special education director, in addition to a number of Richards Elementary administrators, teachers, ABA aides and psychologists. Bartholomew proposed a placement for Bobby's 2002-2003 school year that consisted of kindergarten classroom education at Richards Elementary, five days per week, from 8:10 a.m. to 2:30 p.m. each day. Under the proposed placement, Bobby would participate in all kindergarten activities with support from a full-time, one-to-one teaching assistant, in addition to special education staff. The full-day kindergarten placement also provided for special instruction from the learning resource teacher for 60 minutes each day, 40 minutes per week of direct instruction from the kindergarten teacher, three 30-minute speech therapy sessions per week, and 30-minute occupational therapy sessions twice a week. When Bartholomew finished outlining this proposal, the meeting effectively ended. By all accounts, the Browns were so profoundly opposed to this proposal that they simply stated their disagreement with Bartholomew and left the meeting.

The Browns then filed their second request for a due process hearing. Their complaint to the Independent

Hearing Officer ("IHO") alleged that Bartholomew's conduct in negotiating Bobby's 2002-2003 placement violated both the procedural and substantive requirements of the IDEA. The Browns asserted first that Bartholomew had predetermined Bobby's IEP before the May 2002 case conference without soliciting input from the Browns and their experts.[1] The IHO disagreed, noting that it is permissible for case conference participants to approach negotiations with drafts of a proposed IEP, as both parties did in this case. According to the IHO, there was no evidence that Bartholomew approached the case conference unwilling to review, discuss or compromise on its proposal. Because the Browns halted negotiations before any give-and-take could occur, in the IHO's view, they had no basis to claim that Bartholomew's proposal was set in stone. The IHO next considered the Browns' protest that the IEP, as proposed by Bartholomew at the May 2002 conference, did not contain a plan to transition Bobby into the full-day placement. Although the IHO recognized that no transition plan was proposed, he concluded that impasse on the placement itself preempted any discussion of transition methods; accordingly, Bartholomew's failure to offer such a plan did not violate the IDEA. Finally, the IHO addressed the Browns' substantive contention that Bartholomew's proposal was not "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982).[2] After reviewing the record and hearing testimony

---

[1] The Supreme Court recently has clarified that, under the IDEA, the student and the student's parents bear the burden of proof in an administrative hearing challenging a school district's IEP. *See Schaffer ex rel. Schaffer v. Weast*, 126 S. Ct. 528, 536-37 (2005).

[2] This standard, articulated by the Court in *Rowley*, is the
(continued...)

from both parties' experts, the IHO concluded that the proposed full-day kindergarten placement was appropriate under the circumstances. The IHO recognized that, as Bobby grows older and his peers outpace his development, Bobby may require more at-home schooling. Nevertheless, according to the IHO, Bartholomew should have been given the opportunity to try a full-day program with appropriate support in order to determine Bobby's suitability to that type of placement.

On appeal to the Indiana Board of Special Educational Appeals ("BSEA"), the IHO's decision was upheld in all respects. The Browns had argued to the Board that the parties dispute was not, at bottom, a dispute over conflicting methodologies; rather it turned on whether Bartholomew's proposal was appropriate. The BSEA rejected this characterization of the dispute. In its estimation, the parties were arguing simply about which program was "better." Appellant's App. at A68. The IDEA, according to the BSEA, did not require Bartholomew to provide Bobby with the better or best possible education; Bartholomew's duty was only to tender a program that was reasonably designed to produce meaningful educational results. The BSEA concluded that Bartholomew had fulfilled this obligation.

**B.  District Court Proceedings**

---

[2] (...continued)
benchmark against which IEPs are measured to determine whether they provide a disabled child with the free appropriate education contemplated by the IDEA. *See, e.g., Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. # 221*, 375 F.3d 603, 609 (7th Cir. 2004).

A party aggrieved by the decision of a local educational agency may bring a civil action for review of that decision by a federal district court. *See* 20 U.S.C. § 1415(i)(2)(A). The Browns exercised their right to judicial review and brought this action in the United States District Court for the Southern District of Indiana. Count I of their complaint sought redress for the denial of Bobby's right to a free appropriate education, and repeated allegations of both substantive and procedural violations of the IDEA on the part of Bartholomew. Count II invoked the Browns' right to a "stay-put" or "pendency" injunction that would preserve Bobby's 2001-2002 IEP and the incorporated terms of the parties' February 2000 settlement agreement. *See id.* § 1415(j) ("[D]uring the pendency of any proceedings conducted pursuant to this section, . . . the child shall remain in the then-current educational placement . . . ."). In other words, the stay-put injunction would keep Bobby in a half-day kindergarten placement pending the resolution of the Browns' action in the district court and any subsequent appeal. The Browns' complaint alleged that Bartholomew was "not prepared to honor [Bobby's] pendency entitlements." R.1 at 9. Therefore, in their prayer for relief, the Browns not only sought reversal of the administrative decisions, but also continuation of the half-day kindergarten placement and the terms of the settlement agreement, in addition to attorneys' fees and costs.

The district court upheld in full the state administrative decisions in favor of Bartholomew. On the issues relevant to this appeal, the district court determined: (1) that Bartholomew officials had not pre-determined the proposed change to Bobby's program without involving the Browns in the process; (2) that Bartholomew did not violate the IDEA by failing to provide adequate means to transition Bobby into the proposed placement; and (3) that the pro-

posed placement was reasonably calculated to provide Bobby a free appropriate education within the meaning of the IDEA.

With respect to improper pre-determination, the Browns argued to the district court that Bartholomew officials had finalized Bobby's IEP before the May 16, 2002 meeting. As evidence, they invited the court's attention to the notes, memoranda and e-mails of several Bartholomew officials discussing, in concrete terms, Bobby's placement. The Browns also introduced evidence of a visit to the Browns' home by Dr. Umbreit, who, at this visit, allegedly possessed a finalized version of Bartholomew's proposed IEP. At the due process hearing, Dr. Umbreit denied that he had finalized the IEP before the May 16, 2002 meeting. The district court considered the evidence and testimony and disagreed with the Browns that the record indicated pre-determination on the part of Bartholomew. Instead, the court saw the evidence as reflecting Bartholomew's thoughtful preparation for the May 16, 2002 meeting, consistent with the school district's obligations under the IDEA. *See* R.89 at 12 (noting that the IDEA requires a school district to "devote meaningful individualized consideration to a child's needs"). The court acknowledged that "[a] lack of adequate preparation for a case conference could violate this requirement, just as a final decision without meaningful input could violate the statute in a different way." *Id.* Descriptions of the meeting itself, moreover, persuaded the district court that the parties, in fact, engaged in a meaningful give-and-take that resulted in compromise on certain issues. That Bartholomew ultimately was unwilling "to yield on the particular issue of placement" did not, in the court's view, "by itself establish pre-determination or any other denial of the parental right of involvement." *Id.* at 13.

The Browns contended that, without designing a means

to ease Bobby's transition into the proposed placement, the 2002-2003 IEP was not reasonably calculated to enable Bobby to receive educational benefits. The district court, however, agreed with the conclusions of the IHO on this issue and held that Bartholomew was not obliged to design a transition plan until the parties had agreed on Bobby's actual placement, a goal that they never could accomplish. According to the court, "[t]he discussion simply never got far enough to work out a transition plan to a new program that the Browns adamantly opposed." *Id.* at 18.

Finally, in considering the Browns' substantive attack on the proposed IEP, the district court emphasized that, under applicable standards of review, the Browns were forced to show "that the Proposed IEP was not reasonably calculated at the time of its drafting." *Id.* at 24; *see generally Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 991 (1st Cir. 1990) ("[A]ctions of school systems cannot . . . be judged exclusively in hindsight."). The district court concluded that the Browns had failed to satisfy this burden. In the court's view, the evidence demonstrated "only an honest disagreement among professionals who have devoted their careers to educating children with autism." R.89 at 25.

## II

## DISCUSSION

The Browns now have presented to us their claims of IDEA violations, both substantive and procedural, related to the proposed placement for Bobby's 2002-2003 school

year. We cannot address these claims, however, without first ascertaining whether there remains a live controversy between the parties.

Article III, § 2 of the Constitution grants jurisdiction to federal courts to adjudicate only "actual, ongoing controversies." *See Honig v. Doe*, 484 U.S. 305, 317 (1987). For a case to be justiciable, a live controversy must continue to exist at all stages of review, not simply on the date the action was initiated. *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990); *Jordan by & through Jones v. Indiana High Sch. Athletic Ass'n, Inc.*, 16 F.3d 785, 787 (7th Cir. 1994). A case becomes moot when a court's decision can no longer affect the rights of litigants in the case before them and simply would be "an opinion advising what the law would be upon a hypothetical state of facts." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (internal quotation marks omitted). In an action seeking only injunctive relief, this requirement ordinarily means that, once the threat of the act sought to be enjoined dissipates, the suit must be dismissed as moot. *See, e.g.*, *Wernsing v. Thompson*, 423 F.3d 732, 744-45 (7th Cir. 2005). If, however, a plaintiff also seeks monetary damages, his case is not moot even if the underlying misconduct that caused the injury has ceased. *See Powell v. McCormack*, 395 U.S. 486, 496 (1969) (holding that, although injunctive relief was moot, a case or controversy still existed because the plaintiff requested declaratory relief and damages); *Crue v. Aiken*, 370 F.3d 668, 677-78 (7th Cir. 2004) ("When a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive.").

Soon after the district court rendered its decision in this action, and immediately following Bobby's ninth birthday, the Browns moved from Columbus, Indiana, to Greensburg, Indiana, and enrolled Bobby in a new elementary school

operated by the Greensburg Community School Corpora-
tion ("GCSC"). Shortly thereafter, the Browns and the GCSC
agreed to a new IEP to govern Bobby's 2005-2006 school
year at Greensburg Elementary. Bartholomew contends that
the Browns' relocation to a different school district and an
acceptance of a new IEP in that district renders any dispute
over Bobby's IEP in Bartholomew moot because a judicial
decision in the Browns' favor could no longer benefit Bobby.

In reply, the Browns maintain that they continue to
possess a claim for monetary damages. The nature of this
claim, according to the Browns, originated in their rights
under the stay-put injunction that held in place Bobby's
2001-2002 IEP and under the parties' settlement agreement
that Bartholomew was to cover the expenses related to
Bobby's ABA instruction. The Browns contend that
Bartholomew breached this obligation when it failed to
reimburse the Browns for the salary they had paid to Dr.
Sundberg, who substituted as Bobby's ABA consultant
when Janet Rumple's professional obligations required that
she reduce her time commitment to Bobby. The IDEA gives
a district judge the discretion "to order school authorities to
reimburse parents for their expenditures on private special
education for a child if the court ultimately determines that
such placement, rather than a proposed IEP, is proper under
the Act." *See Burlington Sch. Comm. v. Massachusetts Dep't of
Educ.*, 471 U.S. 359, 369-71 (1985) (interpreting 20 U.S.C. §
1415(h)(2)(B)). Indeed, other circuits have held that a claim
for "reimbursement can defeat a mootness challenge in an
IEP placement dispute." *Lillbask ex rel. Mauclaire v. Conn.
Dep't Educ.*, 397 F.3d 77, 89 (2d Cir. 2005) (collecting cases).

A review of the record, however, demonstrates that the
Browns failed to articulate a claim for damages in the
district court; they sought only injunctive and declaratory
relief. The record of the Browns' proceedings before the IHO
and the BSEA contains vague indications that, at some

point, the Browns sought reimbursement for the salary they paid to Dr. Sundberg. The IHO's decision lists, as "Primary Issue Number One," "What are the student's continuing rights of pendency and stay put under the statute, regulation, decisional law and the express written settlement agreement between the parties?" R.66, Ex.B at 3. It then dispensed with this issue by noting:

> By stipulation Primary Issue Number One concerning stay-put had been resolved by parties prior to hearing and was withdrawn. Pursuant to agreement of parties stay put placement was the 1/2 day LEA Kindergarten and the Applied Verbal Behavior (AVB) in-home program after school, including services of program overseer (Janet Rumple) and two aides (Libby Springmeyer and Sara Miller), and the placement was funded by [Bartholomew].

*Id.* at 4. On appeal to the BSEA, the Browns asked that these stipulated pendency entitlements be converted into Bobby's placement for the 2002-2003 school year, with the added requirement that Bartholomew cover the cost of "continuing the role of Dr. Sundberg as Bobby's program consultant." R.76, Tab 3 at 6 n.2; *see also id.*, Tab 5 at 114.

At the district court level, the Browns apparently abandoned this claim for reimbursement. Their prayer for relief asked, in addition to reversal of the administrative decisions, that Bobby's "preexisting pendency/stay-put program be continued in full force and effect, funded by [Bartholomew]." R.1 at 9-10. The Browns' complaint did not assert that the preexisting program was inadequate, nor did it ask for reimbursement for Dr. Sundberg's services. Also absent from the Browns' lengthy trial briefing before the district court was a claim for reimbursement. The closest the Browns ever came to asserting a right to compensatory education was when, in their "Trial Brief," they described the relevant Supreme Court precedent that allows a district

court to award reimbursement to a parent who spends her own money on private education that the court finds appropriate. *See* R.65 at 31-32 (discussing *Burlington*, 471 U.S. at 369-71, and *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993)). The trial brief never went on to apply this precedent to the facts in Bobby's case nor to explain why it entitled the Browns to reimbursement for Dr. Sundberg's services.

Relief in the form of reimbursement for out-of-pocket educational expenses, or "compensatory education" as it is formally called, "is, as we [have] said, indeed exceptional and nowhere expressly authorized by the statute." *Bd. Educ. Oak Park & River Forrest High Sch. Dist. 200 v. Todd A.*, 79 F.3d 654, 657 (7th Cir. 1996). The IDEA only authorizes a district court to award aggrieved parents "such relief as the court determines is appropriate." 28 U.S.C. § 1415(h)(2)(B). Consistent with the Supreme Court's reading of this provision in *Burlington*, 471 U.S. at 369-70, courts have held that a district court's authority encompasses a "range of equitable remedies and therefore empowers a court to order . . . compensatory education if necessary to cure a violation." *Todd A.*, 79 F.3d at 656; *see also G ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308-09 (4th Cir. 2003) (collecting cases from different circuits). However, as an equitable remedy, awarding compensatory education is a decision that rests in the sound discretion of the district court. *See Lester H. v. Gilhool*, 916 F.2d 865, 872 (3d Cir. 1990).

Here, the Browns' complaint deprived the district court of an opportunity to exercise that discretion. As we have pointed out, the complaint contains no specific mention of reimbursement, and a request for such damages cannot be inferred from the language of the complaint. By requesting that the "preexisting pendency/stay-put program be continued in full force and effect," R.1 at 9-10, the Browns'

complaint actually suggests that they were amenable to the status quo and needed no additional reimbursement for the cost of hiring Dr. Sundberg. This is in contrast to the Browns' pleadings before the administrative bodies, which at least to some extent seemed to request alterations to the Browns' pendency entitlements. Since the Browns evidently knew of their reimbursement rights throughout the administrative process and yet did not present the matter in their complaint to the district court, we must treat any claim for reimbursement as abandoned in this action.

It was not until the Browns' reply brief in this court that they mentioned seeking an award of compensatory education in connection with their federal challenge to the 2002-2003 IEP. This late mention "falls short of the requisite timeliness and formulation necessary to preserve a claim for damages." *Thomas R.W. v. Massachusetts Dep't Educ.*, 130 F.3d 477, 480 (1st Cir. 1997). Consequently, the Browns' claim for compensatory education is deemed waived and cannot supply the residual live controversy necessary to prevent their entire claim from being moot.[3]

---

[3] This result is consistent with other courts of appeals who have refused to save an action from mootness by crediting a belated claim for compensatory education. In *Thomas R.W. v. Massachusetts Department of Education*, 130 F.3d 477 (1st Cir. 1997), parents of a disabled student contested their school district's refusal to provide the child with a full-time aide at the child's private school. The court dismissed the case as moot, over protests of parental rights to compensatory education, because the parents "failed to articulate a claim for damages in the district court, where [they] sought only injunctive and declaratory relief." *Id.* at 480. Similarly, in *Lillbask ex rel. Mauclaire v. Connecticut Department of Education*, 397 F.3d 77 (2d Cir. 2005), the court dismissed as moot a parents' challenge to an IEP proposal for a school year

(continued...)

The Browns next seek recourse in the exception to the mootness doctrine for " 'wrongs capable of repetition, yet evading review.' " *See Honig*, 484 U.S. at 318 (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)). This exception, which applies only in "exceptional situations," *Spencer v. Kemna*, 523 U.S. 1, 17 (1998), saves a case from being moot when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy*, 455 U.S. at 482 (quotation marks omitted). Because IEP challenges usually endure longer than the nine-month school year, most circuits hold that the first, durational element of the mootness exception is satisfied in these cases. *See, e.g., Rome Sch. Comm. v. Mrs. B.*, 247 F.3d 29, 31 (1st Cir. 2001) (collecting examples of controversies regarding IEPs that "are likely to evade review because the administrative and judicial review of an IEP is ponderous and usually will not be complete until a year after the IEP has expired" (internal quotation marks omitted)).

Consequently, the mootness question in this case must turn on the second prong of the exception, namely whether

---

[3]  (...continued)
that had long since passed. Ms. Lillbask's claim on appeal that she continued to possess a right to compensatory education failed to preserve a live controversy. As the court pointed out, "Lillbask's Fourth Amended Complaint [was] bereft of any prayer for compensatory education relief; indeed the complaint fails to make any mention whatsoever of Lindsey's need for compensatory education." *Id.* at 90. Given that earlier pleadings had included such relief, the court found it "inappropriate to read a prayer for compensatory relief into Lillbask's Fourth Amended Complaint" and thereby save the case from mootness. *Id.*

a "reasonable expectation" exists that, in the future, Bartholomew will again subject Bobby to an IEP that proposes to deny him of a free appropriate education. As the Supreme Court has recognized, this "reasonable expectation" of repetition must be more than "a mere physical or theoretical possibility." *Murphy*, 455 U.S. at 482. The Browns ground their expectation of reinjury in the fact that Bobby remains, despite enrolling in a different school district, "at the mercy of [Bartholomew], a supervisory power which directs the activities of the local special education authority that will supervise and direct the development of Bobby's IEP in the future." Appellant's Reply Br. at 1. Bartholomew responds that, although Bartholomew serves as administering corporation in a joint relationship with Bobby's new school district, Bartholomew retains no control or influence over the IEPs offered by the new district. *See* Appellee's Br. at 27-28.

In *Honig*, on which the Browns rely heavily, an emotionally disturbed student claimed that school district authorities violated an IDEA-precursor by excluding the student from school in response to his dangerous and disruptive behavior. In refusing to dismiss the case as moot, the Supreme Court held that there was a "reasonable likelihood" that the school officials would exclude the student again given (1) "the nature of [the student's] disability," and (2) the school officials' insistence on their right to unilaterally exclude the student from class. *Honig*, 484 U.S. at 318-19.

Bobby's case implicates neither *Honig* factor. In *Honig*, there was an inextricable link between the student's violent behavior and the challenged policy of exclusion. Precisely because of the child's "inability to conform his conduct to socially acceptable norms," the Supreme Court was willing "to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at

risk of injury." *Id.* at 320. Here, Bobby's autism presents an evolving set of challenges for educators, one that requires his IEP to be periodically revised. What was right for Bobby in kindergarten may not be the proper educational program when he enters the third grade. The dispute over the 2002-2003 IEP turned on whether Bobby was ready for full-time mainstream class. Now, as a nine-year old, Bobby's readiness for mainstream education presents a different question calling for reassessment of his educational development. Were we to decide, at this later date, whether mainstreaming was right for Bobby back in 2002-2003, we would be issuing, in effect, an advisory opinion. Our decision would merely tell the parties who was correct about Bobby's outdated IEP. It would do nothing to define the contours of the parties' continuing legal relationship under the IDEA such that future repetitions of the injury could be avoided. The case therefore must be dismissed as moot.

Moreover, Bobby's case presents a situation virtually identical to *Downers Grove Grade School Number 58 Board v. Steven L.*, 89 F.3d 464 (7th Cir. 1996). There, a district court had refused to dismiss a parents' IDEA case as moot because the school district and the parents had "conflicting educational philosophies and perceptions of the mainstreaming and methodological requirements under the IDEA." *Id.* at 467 (internal quotation marks omitted). The district court reasoned that it had jurisdiction to "adequately inform the parties of the contours of their continuing relationship" under the statute. *Id.* (internal quotation marks omitted). We reversed, holding that, because the parents had "already agreed to a new IEP with a different school district," they "are without an actual injury traceable to the defendant that could be redressed by a favorable judicial decision." *Id.* (quotation marks omitted). In our view, "[j]udgment either way would not effect [sic] An-

drew's fifth grade IEP, a circumstance long gone." *Id.* There was, therefore, no injury capable of repetition yet evading review. The record before us requires an identical conclusion.

## Conclusion

Accordingly, the judgment of the district court is vacated, and the case is remanded with direction that it be dismissed as moot. The parties shall bear their own costs in this appeal.

VACATED AND REMANDED WITH DIRECTION

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*