# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-2724

BRIDGETT STEVENS,

*Plaintiff-Appellant*,

*v.*

HOUSING AUTHORITY OF
SOUTH BEND, INDIANA, *et al.*,

*Defendants-Appellees*,

and

STATE OF INDIANA,

*Intervenor-Appellee*.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:08-cv-00051-RL—**Rudy Lozano,** *Judge*.

ARGUED JANUARY 19, 2011—DECIDED DECEMBER 1, 2011

Before POSNER, KANNE and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*.     Bridgett Stevens lived in
federally-subsidized public housing in South Bend,

Indiana.[1] In 2008, she received three "Notice to Terminate Lease" letters from the Housing Authority of South Bend ("HASB"), each alleging that she had violated lease provisions that prohibited criminal activity on the property. After receiving the first notice, Stevens sued HASB and a number of individuals, alleging violations of the Fair Housing Act, the Fourteenth Amendment, and certain provisions of Indiana state law. After receiving the third notice, she vacated the property. The district court granted summary judgment in favor of the defendants on the federal claims and declined to exercise jurisdiction over the remaining state law claims, dismissing them without prejudice. Stevens appeals.

## I.

Stevens entered into a lease with HASB in September 2007. R. 62-5, at 6-23. Stevens was listed on the lease as "Resident." The lease named her two sons, Alfernando Stevens (then seventeen years old) and Armondo Brown (then eight years old), as "Household Members." The lease provided, among other things, that certain criminal

---

[1] Although Bridgett Stevens spells her first name with two "t"s, the Complaint, the pleadings, and the briefs on appeal for both the plaintiff and the defendants spell her name with a single "t." *See* Personal Declaration, R. 62-5, at 1; Dwelling Lease, R. 62-5, at 23; R. 62-5, at 34 (Stevens' handwritten note to HASB relinquishing her apartment). We will use the plaintiff's own spelling and correct the case caption accordingly.

activities could result in immediate termination of the lease:

> Criminal Activity Grounds for Termination by HASB. HASB has a One Strike or "Zero Tolerance" policy with respect to violations of Lease terms regarding criminal activity. Either of the following types of criminal activity by the Resident, any member of the household, a guest, or another person under their control shall be cause for termination of this Lease and eviction from the Dwelling Unit, even in the absence of an arrest or conviction:
>
> (i) Any criminal activity that threatens the health, safety or right to peaceful enjoyment of HASB public housing premises by other Residents; or
>
> (ii) Any drug-related criminal activity on or off such premises.
>
> ANY CRIMINAL ACTIVITY OR DRUG-RELATED CRIMINAL ACTIVITY SPECIFIED ABOVE CONSTITUTES A SERIOUS VIOLATION OF MATERIAL TERMS OF THE LEASE AND WILL BE GROUNDS FOR TERMINATION OF THE LEASE AND EVICTION FROM THE DWELLING UNIT. SUCH ACTIVITY CONSTITUTES GROUNDS FOR TERMINATION AND EVICTION NOTWITHSTANDING THE ABSENCE OF AN ARREST OR CONVICTION.

Dwelling Lease, R. 62-5, at 19-20 (emphasis in original).

Peace in the Stevens household was short-lived. On December 25, 2007, Stevens' daughter, Ebony Harmon, came to visit with her children. Harmon and her

children were driven to Stevens' apartment building by Harmon's boyfriend, Chester Higgins. At around the same time, Stevens' son, Alfernando flagged down Marcus Henderson for a ride home. Henderson was the father of Ebony Harmon's children. Although there were different accounts of what happened when Henderson and Higgins encountered each other, it is undisputed that the two engaged in a gunfight in the parking lot of Stevens' apartment building. Henderson fled before the police arrived, and Harmon drove a wounded Higgins to the hospital. Both men survived the incident.

On January 14, 2008, a few weeks after the shooting, HASB issued its first "Important 30 Day Notice to Termi-nate Lease" ("First Notice") to Stevens. R. 62-5, at 24-26. Although Stevens disagrees with the portrayal of the shooting in the First Notice, she does not dispute that Henderson was at the property because Alfernando asked him for a ride. Nor does she dispute that Higgins was there because he drove Stevens' invited guest, Ebony Harmon, to the apartment. Citing the "Zero Tolerance" policy, the First Notice directed Stevens to vacate the apartment by January 31, 2008.

Instead of moving out, Stevens filed this lawsuit against HASB, the executive director of HASB, and five commissioners of HASB. Stevens alleged that the defen-dants (1) violated the Fair Housing Act, 42 U.S.C. § 3604(b), by locating her publicly-funded apartment building in a primarily African-American neighborhood, segregating her on account of race; (2) interfered with her right to

make and enforce a contract by terminating her lease on account of race; (3) breached a contract between themselves and the United States Department of Housing and Urban Development ("HUD"), for which Stevens was a third-party beneficiary; and (4) violated her right to equal protection and due process by threatening to take action against her under the Indiana ejectment statute, in contravention of 42 U.S.C. § 1983.[2] In each instance, Stevens alleged that the defendants' actions caused her emotional distress. She sought a declaratory judgment that the Indiana ejectment statute violates both state and federal law, an injunction against the application of the ejectment statute to her, and both compensatory and exemplary damages.

After Stevens filed her suit but before she served the defendants, HASB filed an action for immediate possession of Stevens' unit in state court. When HASB became aware of the lawsuit, it dismissed the state court action and reasserted the claim for immediate possession as a compulsory counterclaim in the instant case.

On November 6, 2008, HASB issued an "Important 30-day Notice to Terminate Lease for Disturbing the Peace and for an Unauthorized Live In" ("Second Notice"). R. 62-5, at 27-29. The Second Notice asserted that the South Bend Police Department reported to HASB on November 5, 2008 that police officers were called to Stevens'

---

[2] Stevens also asserted two counts arising under Indiana law, neither of which is at issue in this appeal.

apartment to investigate a fight. The officers determined that Stevens had stabbed her husband, Christopher Broadnax, during an argument.[3] The Second Notice also alleged that the police had been called to the apartment on October 2, 2008, for another altercation between Stevens and Broadnax. At that time, Broadnax told police officers that he was on house arrest and was using Stevens' unit as his principal place of residence. He also told the officers that Stevens was high on crack cocaine and had started the fight. The officers determined that there was an outstanding warrant for Stevens for an unrelated charge for retail theft and therefore arrested Stevens. The Second Notice, again citing the "One Strike" policy, directed Stevens to vacate the apartment by December 8, 2008.

Only a few weeks later, on November 24, 2008, HASB issued its final "Important 30-day Notice to Terminate Lease" ("Third Notice") to Stevens. R. 62-5, at 30-33. Building on the incidents detailed in the Second Notice, HASB asserted that Broadnax accused Stevens of stabbing him on November 5th during an argument over the placement of his house arrest monitor in her home. Broadnax claimed to be living in Stevens' apartment but

---

[3] As with the First Notice, Stevens denied the portrayal of events depicted in the Second Notice. She denied using illegal drugs, and denied stabbing her husband. She did concede that, while she was peeling potatoes, Broadnax ran up to her and "ended up getting stabbed with the knife—well, got punched with the knife." R. 62-3, at 42-43. She asserted that the stabbing was not intentional.

was not listed as a "Household Member" on the lease.[4] Broadnax had also reported to the responding police officers that Stevens was smoking marijuana a few hours before the fight. The officers discovered two "marijuana blunt roaches" on the kitchen counter.[5] Based on these incidents, the Third Notice directed Stevens to vacate the apartment by December 24, 2008.

Stevens never challenged the Second or Third Notices. Instead, she vacated the property in January 2009. She left a handwritten note for HASB which read, in its entirety:

> 1 - 27 - 09
>
> South Bend Housing, I Bridgett Stevens have lost my keys to 1265 South Bend Ave. I am now done with unit. thank [sic] you. Ms. Stevens

R. 62-5, at 34. The defendants asserted that Stevens' departure from her apartment was "voluntary," in the

---

[4] Stevens denied that her husband lived at the apartment but conceded that he registered her address as his home for the purposes of his home detention monitor for approximately two to three weeks in 2008. R. 62-3, at 41. Allowing Broadnax, an unauthorized tenant, to live in the apartment for that length of time violated one of the terms of Stevens' lease.

[5] A "marijuana blunt" is a cigar that has been hollowed out and refilled with marijuana. *See Pole v. Randolph*, 570 F.3d 922, 945 n.10 (7th Cir. 2009). A "roach" is the "butt of a marijuana cigarette." Webster's Unabridged Dictionary of the English Language, RHR Press, 2001. The presence of controlled substances in the apartment violated the terms of Stevens' lease.

sense that she acquiesced to the Second and Third No-
tices. Stevens, of course, sees her departure as forced.
Nevertheless, she never challenged the Second or Third
Notices, and never amended her complaint to add any
claims relating to those Notices.

The district court found that Stevens' challenges to the
Indiana ejectment statute are moot because she left her
apartment in response to the Second and Third Notices.
She did not contest the factual or legal bases for those
Notices. The court also determined that her claims did
not meet any of the exceptions to the mootness doctrine.
The court rejected Stevens' segregation claim because it
was untimely, because it related only to post-acquisition
claims of discrimination, and because she failed to
provide any evidence in support of the claim. The court
ruled in favor of the defendants on Stevens' Section 1981
claim relating to making and enforcing her lease agree-
ment because she failed to set forth any evidence that
the termination of her lease was based on racial discrim-
ination. Instead, Stevens herself claimed only that her
lease was terminated because HASB was holding her
responsible for the actions of other persons who were
not under her control. Stevens' third-party beneficiary
claim failed because, among other things, she failed to
supply any evidence that HASB breached any contract
with HUD. Finally, the court rejected Stevens' claim that
the First Notice violated her equal protection and due
process rights by holding her responsible for the actions
of persons who were not under her control. Stevens
conceded facts that demonstrated that one of the
shooters, Henderson, was present at the apartment as

an invited guest of Stevens' son, who in turn was listed as a Household Member on the lease. Although Henderson was not literally under Stevens' control in the colloquial sense, he was present only because a Household Member invited him and allowed him access to the premises. The district court found that this was sufficient to establish control under federal housing regulations. The court deemed it absurd to suggest that a tenant must be able to physically overpower a guest before control may be established. As we noted above, the court declined to exercise jurisdiction over the remaining state law claims, dismissing them without prejudice. Steven appeals.

## II.

On appeal, Stevens contends that (1) the district court misapplied governing law on summary judgment standards; (2) the court erred in concluding that Stevens' claims were moot; (3) the one-strike policy, as applied to Stevens, violated the criteria set forth in *Department of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125 (2002); (4) the court erred in granting summary judgment on the segregated housing claim because the evidence demonstrated disputed issues of material fact; (5) Stevens had standing on all of her claims, and no claims were barred by the statute of limitations; and (6) the court erred in finding that evidence of other lease violations justified Stevens' eviction.

**A.**

Stevens' contention that the district court misapplied the standard for summary judgment is a nonstarter. She complains that HASB was not put to the burden of showing the absence of a genuine issue of material fact. Citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), Stevens contends that HASB failed to carry its burden when it did not foreclose the possibility that there were any disputes of material fact. This deficiency alone, according to Stevens, required the district court to deny summary judgment. But the district court did not misstate or misapply the standards for summary judgment. And even if it had, our review is plenary, and so "we can (and will) make an independent decision under the proper standards." *Yindee v. CCH Inc.*, 458 F.3d 599, 601 (7th Cir. 2006).

Moreover, we rejected this very argument recently in *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642 (7th Cir. 2011).[6] In that case, the plaintiff also claimed that, under *Adickes*, it was under no burden to produce evidence showing an issue of genuine fact unless the defendant "wholly extinguishe[d] the possibility that the events forming the basis of his opponent's claims occurred." *Crawford*, 647 F.3d at 648. We characterized this

---

[6] Indeed, Stevens' argument appears to be literally cut-and-pasted from *Crawford*. Counsel for Stevens was also counsel for the plaintiff in *Crawford*, and on page 8 of Stevens' opening brief, counsel inadvertently refers to the defendant as Countrywide, the defendant in the *Crawford* case.

interpretation as a "misapplication of *Adickes*" that is "flatly contradict[ed]" by *Celotex:*

> A party moving for summary judgment need not introduce evidence rendering its opponents' claims altogether impossible in order to trigger the opponent's burden to answer with its own supporting evidence. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*Crawford*, 647 F.3d at 648. As was the case in *Crawford*, HASB's motion for summary judgment comprehensively challenged the factual and legal support for Stevens' claims. The burden then shifted to Stevens to cite evidence in the record demonstrating that genuine issues of material fact remained for trial. *Crawford*, 647 F.3d at 648; Fed. R. Civ. P. 56. As the district court properly did, we will apply the standards set forth in *Celotex* in reviewing the judgment.

**B.**

Stevens next contends that the district court erred in concluding that her claims were moot. As will become apparent below, our resolution of this issue will necessarily require us to address Stevens' third claim on appeal, whether a strict liability eviction violates the Supreme Court's dictate in *Rucker*. Whether a case is moot is a question of law that we review *de novo*. *Gates v. City of Chicago*, 623 F.3d 389, 413 (7th Cir. 2010); *Olson v. Brown*, 594 F.3d 577, 580 (7th Cir.), *cert. denied*, 130 S.Ct. 3478 (2010). "A case is moot when the issues presented

are no longer live or the parties lack a legally cognizable interest in the outcome." *Gates*, 623 F.3d at 413 (citing *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980)) (internal quotation marks omitted). According to Stevens, the court improperly construed the facts in favor of the defendant when it found that Stevens "voluntarily" left HASB property after the Second and Third Notices and thus suffered no damages from the First Notice. She maintains that her departure was not voluntary but was forced by the Second and Third Notices, each of which demanded that she vacate the property within thirty days. As Stevens notes, the district court acknowledged this in a footnote:

> The term "voluntary" is not being used to suggest that Plaintiff wanted to leave, rather, that she was not forced to leave by any court order or physical use of force. Plaintiff continues to contend that her move was not voluntary in the sense that she only left because the notice informed her that she had to move within 30 days.

*Stevens v. Housing Auth. of South Bend*, 720 F.Supp.2d 1013, 1020 n.4 (N.D. Ind. 2010). Stevens contends that because her departure was involuntary, a live dispute remains and the case is not moot.

The defendant, on the other hand, insists that Stevens voluntarily vacated the apartment because she simply decided to leave. Having voluntarily left, HASB contends that her claims relating to the First Notice are moot. The source of the confusion is apparent: Stevens' departure was not voluntary in the colloquial sense of

the term. She did not wish to lose her apartment and left only because she received the Second and Third Notices. Each of those Notices indicated that she had violated the lease in a manner different from and in addition to the incident that led to the First Notice, and each subsequent Notice directed her to vacate the property within thirty days. In her own words, she "didn't volunteer to vacate," but when told she had thirty days to move, she decided not to fight those additional Notices and "just decided to move." R. 62-3, at 48; R. 62-4, at 10.

Whether she left voluntarily or was forced out by the additional Notices is irrelevant, however, to the issue of mootness. A case is moot when a plaintiff no longer has a legally cognizable interest in the outcome. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 626 (7th Cir. 2007). When a court's decision can no longer affect the rights of the litigants in the case before it, the case becomes moot. *St. John's*, 502 F.3d at 626; *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir. 2006). Stevens left for reasons other than the First Notice, and her lawsuit is based entirely on the consequences of the First Notice. Given that she ultimately left her apartment for reasons unrelated to the acts that form the basis of the lawsuit, the appropriate question is whether she retains a legally cognizable interest in the outcome of the suit and whether the court's decision could affect her rights. She can no longer be restored to the apartment because she has decided not to contest two subsequent eviction Notices based on reasons independent of the acts alleged in this

case. Injunctive relief is therefore no longer available to her. *St. John's*, 502 F.3d at 626-27. Declaratory relief suffers from the same mootness problem because it would have no impact on Stevens going forward. *St. Johns's*, 502 F.3d at 628.

Other evidence further confirms that injunctive relief is unavailable to Stevens. In addition to Stevens' eviction for the reasons stated in the Second and Third Notices, HASB discovered during the litigation that Stevens lied on her application for the unit. In particular, Stevens denied having previously resided in public housing, a denial which allowed her to conceal that she still owed money to HASB for the prior tenancy. Applicants for public housing who owe money from prior tenancies are not offered new housing until the balance has been paid. Moreover, the falsification of the application was itself a violation of federal law that could lead to fines and imprisonment. *See* 18 U.S.C. § 1001. Stevens certified when signing her application that all of the information given was true and correct, but admitted in her deposition that she gave a false answer to the question regarding prior residency in public housing. R. 62-4, at 48; R. 62-3, at 23.[7] Stevens also violated her lease when she allowed her husband to stay at her home

---

[7] Although Stevens also testified that she was told she needed to answer certain questions for the three-year period prior to the application, the application on its face contains no such limitation and in fact asks if she "ever" lived in a unit subsidized by a federal program, and whether she "ever" was housed by a Housing Authority. R. 62-4, at 48.

for two to three weeks without obtaining prior written approval from HASB. R. 62-5, at 14; R. 62-3, at 41.[8] Thus, Stevens was not eligible for the apartment in the first instance, could have been evicted even in the absence of the events leading to the First Notice, and eventually acceded to the Second and Third Notices which were issued for lease violations wholly separate from the shooting.

If a plaintiff also seeks monetary damages, however, the case is not moot even if the underlying misconduct that caused the injury has ceased. *Brown*, 442 F.3d at 596. We thus consider next whether Stevens suffered any money damages as a result of the First Notice. Again, by her own testimony, she did not suffer any out-of-pocket losses as a result of the First Notice. R. 62-4, at 12. After the First Notice, she did not leave the apartment

---

[8] Stevens' husband was on a home detention program that required him to allocate a "home detention box" to a particular residence. Stevens testified that, for a period of two to three weeks, Broadnax allocated his home detention box to Stevens' apartment. R. 62-3, at 40-42. Stevens conceded that during the time the box was allocated to her address, Broadnax stayed at her home. Although Stevens' daughter, Ebony Harmon, denied that Broadnax ever lived in her mother's apartment, she also admitted that she did not know how often Broadnax stayed overnight at the apartment. R. 62-6, at 5-6. Given her lack of personal knowledge of the facts, Harmon's testimony cannot create a genuine issue of fact in light of her mother's concession that Broadnax registered the home detention box at her apartment and stayed there for two to three weeks.

and incurred no expenses related to that Notice. Nor did she incur any losses when she moved after the Third Notice (which, again, is not at issue in this lawsuit). She moved into her mother's home rent-free, and her mother paid for the move.

Stevens also claims damages for emotional distress. Although she asserts that some of her distress was caused by her eventual move from the apartment, the move was caused not by the First Notice, the sole subject of this lawsuit, but rather by the Second and Third Notices. We may consider only the emotional distress she suffered as a result of receiving the First Notice.

When the injured plaintiff's testimony is the only proof of emotional damages, she must explain the circumstances of her injury in reasonable detail; she may not rely on conclusory statements. *Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003); *Alston v. King*, 231 F.3d 383, 388 (7th Cir. 2000). A plaintiff must provide evidence of "demonstrable emotional distress," and may not simply point to circumstances of the alleged constitutional violation which might support an inference of emotional injury. *Alston*, 231 F.3d at 388. But "an injured person's testimony may, by itself or in conjunction with the circumstances of a given case, be sufficient to establish emotional distress without more." *Alston*, 231 F.3d at 388.

> [I]n determining whether the evidence of emotional distress is sufficient to support an award of damages, we must look at both the direct evidence of emotional distress and the circumstances of the act that

allegedly caused that distress. . . . The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award for emotional distress.

*United States v. Balistrieri*, 981 F.2d 916, 932 (7th Cir. 1992).

Stevens concedes that she never sought the care of a doctor, psychiatrist, psychologist, health care provider, clergy member, or anyone else to help her cope with her emotional distress. R. 62-4, at 3. She also confirmed that she suffered no physical symptoms caused by her emotional distress. R. 62-4, at 4. When asked to describe her damages from HASB's actions, she replied:

It was Christmas day, my—we didn't even get to enjoy Christmas [and] then you want to put me out of my home with my kids, nowhere to go, it's wintertime for a shooting that you never arrested no one for, no one ever got arrested for, went to jail for that shooting or got evicted. Nobody—the guy never— I mean, I never seen anybody shoot somebody five times and not even go to jail, turn himself in and never go to jail and you want to put me out like that.

R. 62-4, at 2. She further explained that her damages related to receiving the First Notice around Christmas time, shortly after suffering the trauma of the shooting itself, and being blamed for something she did not do and had no control over. R. 62-4, at 3-4. She expressed outrage that, although the shooter was never charged

or convicted, she was subjected to an eviction notice. She described the combination of events as "stressful," and as something she would never forget *Id*.

As Stevens acknowledged, the shooting itself was a traumatic event that contributed to her emotional distress. Receiving an eviction notice holding her responsible for the actions of others no doubt added to her distress. But when we consider the nature of HASB's action and whether it is "inherently degrading or humiliating" to send an eviction notice under these circumstances, we must conclude that Stevens has failed in her burden. An eviction notice is likely to cause anyone great distress but that distress is not compensable when the notice has been lawfully issued.

Although Stevens expresses great outrage at being held responsible for the actions of Henderson, a person who was not her guest and who she repeatedly asserts she could not control, she misunderstands the meaning of both "guest" and "control" in these circumstances. Federal statutes and regulations require that all public housing authorities include in their leases the provision that applied to Stevens here. In particular, the lease must provide that "the tenant shall be obligated:"

> (12)(i) To assure that no tenant, member of the tenant's household, or guest engages in: (A) Any criminal activity that threatens the health, safety or right to peaceful enjoyment of the premises by other residents; or (B) Any drug-related criminal activity on or off the premises;

> (ii) To assure that no other person under the tenant's control engages in: (A) Any criminal activity that

threatens the health, safety or right to peaceful enjoy-
ment of the premises by other residents; or (B) Any
drug-related criminal activity on the premises;

24 C.F.R. § 966.4(f). *See also* 42 U.S.C. § 1437d(l)(6). Stevens
does not dispute that Henderson was a "guest" because
she concedes that her son, Alfernando, who was a House-
hold Member, invited him onto the premises.[9] "Control"
means only that the tenant has permitted access to the
premises. *Rucker*, 535 U.S. at 131. *See also* 24 C.F.R. § 5.100
("Other person under the tenant's control, for the
purposes of the definition of covered person and for parts
5, 882, 966, and 982 means that the person . . . is, or was
at the time of the activity in question, on the premises . . .
because of an invitation from the tenant or other
member of the household who has express or implied
authority to so consent on behalf of the tenant."). The
Supreme Court noted that such "no fault" evictions are
a common practice in landlord-tenant law. Regardless
of knowledge, a tenant who cannot control criminal
activities by guests which threaten the safety of other
residents is herself a threat to the other residents. *Rucker*,
535 U.S. at 134. Moreover, the Court found that the

---

[9] Stevens attempts to distinguish her case from *Rucker* by
asserting that "outside parties" who were not residents and
not under her control engaged in criminal activity. Again, this
misunderstands the meaning of "control." Because it is undis-
puted that Alfernando, a Household Member who had express
or implied authority to consent to Henderson's presence on
the premises, invited Henderson to the apartment complex
that day, the control element is met.

statute allowing a no-fault eviction of a tenant who did not know that a household member or guest was engaged in drug activity or dangerous criminal activity posed no due process problem. *Rucker*, 535 U.S. at 135. The Court noted that the government was not acting as a sovereign in that circumstance but rather was acting as a landlord of property that it owns, and invoking a clause in a lease to which the tenant had agreed and Congress had expressly required. *Rucker*, 535 U.S. at 135. The Court acknowledged that the tenant may have had a property interest in the leasehold interest requiring due process before a deprivation of that interest, but state laws provided for notice and procedures to be followed. *Id*.

Such is the case here as well. Henderson was a guest of Alfernando, a Household Member. Although Stevens could not control Henderson in a literal sense, he was permitted on the premises by a Household Member, and that is all that is required for control. Stevens received formal notice of the lease violation, and HASB initiated an action in state court to accomplish the eviction. Stevens does not claim that the state court action provided inadequate protections for due process purposes. The First Notice was therefore lawfully issued, and Stevens has no claim for emotional distress caused by a wholly lawful action. Because there is no relief that the court could grant her following her departure from the apartment for other reasons, her claims based on the First Notice are moot.

**C.**

Stevens next disputes the district court's ruling in favor of HASB on her claim of segregated housing. In her complaint, Stevens alleges that the defendants and their predecessors located her public housing complex in an area of South Bend that is inhabited primarily by African-American persons. She asserts that the location of the property segregated her and her sons because of race, in violation of Section 3604(b) of the Fair Housing Act. Stevens' evidence in support of this claim consists solely of her personal observation that the residents of the apartment complex were primarily African-American. It is undisputed that the public housing complex in which Stevens lived was constructed in 1961, and so the site was selected approximately forty-seven years before Stevens brought her claim. The district court found that the claim was untimely and also unsupported by relevant evidence. The court also found that the claim failed as a matter of law because actions under Section 3604(b) of the Fair Housing Act must concern access to housing and not post-acquisition claims of discrimination. Stevens contends that her claim is timely because it is based on a continuing violation, and that her own testimony that HASB housing was segregated was sufficient to defeat summary judgment.

Section 3604(b) provides that it shall be unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or

national origin." 42 U.S.C. § 3604(b). We noted in *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004), that the Fair Housing Act is aimed generally at access to housing and does not address post-acquisition discrimination. We later noted that Section 3604(b) applies to discrimination linked to any terms, conditions, or privileges that accompanied or were related to a plaintiff's acquisition of her property. *Bloch v. Frischholz*, 587 F.3d 771, 780 (7th Cir. 2009). In *Bloch*, the plaintiffs were required to agree to certain discriminatory building rules in order to acquire their condominium unit, and we found that was sufficient to bring their claim regarding the application of those rules within the purview of Section 3604(b). Stevens did not contest the district court's conclusion that Section 3604(b) did not apply here because Stevens was granted access to housing, and the defendants urge us to affirm on the ground that Stevens did not dispute this particular part of the ruling. Although Section 3604(b) seems to be a poor fit for Stevens' claim relating to HASB's site selection, the claim fails for a far more simple reason: lack of evidence.

In support of her claim that the apartment complex housed primarily African-American tenants, Stevens cites three pages of her deposition testimony without identifying the portion of the record containing those pages. Our search of the record reveals that only one of the cited pages appears in the record on appeal. R. 62-4, at 15. On that page, Stevens states nothing more than that her unspecified observations were limited to South Bend

Housing Authority units, and that she had no knowledge regarding the neighborhood outside of her HASB residence. She does not reference segregation on that page, and says nothing about the racial make-up of the apartment complex or the neighborhood. Federal Rule of Appellate Procedure 28(a)(7) requires the appellant to submit "a statement of facts relevant to the issues submitted for review with appropriate references to the record." Rule 28(a)(9)(A) requires that the argument section of the appellant's brief contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." We need not credit Stevens' version of the facts when the materials supporting those asserted facts are not part of the record. Stevens failed to cite any evidence in the record that HASB engaged in any discrimination in the selection of the apartment site some forty-seven years before Stevens moved in. There is no evidence in the record regarding the racial make-up of the area at the time the complex was built, and no demographic evidence regarding the area outside of the complex at any time. At most, Stevens presents conclusory allegations unsupported by the record that the apartment complex currently houses mostly African-American tenants. Those conclusory allegations are insufficient to meet Stevens' burden on summary judgment, and the court was correct to grant judgment in favor of the defendants on that claim.

**D.**

Stevens' remaining issues merely restate arguments she made in other contexts. Her main complaint is that issues of fact remained on whether other violations of her lease justified HASB's eviction decision on other grounds. She contends, for example, that a HASB employee told her she was required to provide information regarding criminal convictions only for the three years prior to the application. She argues that this evidence goes to the issue of her honesty in filling out the application. But she also falsely denied on her application that she had "ever" previously lived in public housing. In fact, she still owed money to HASB for her prior tenancy, and would not have been allowed to move in without paying that prior debt.

Stevens also maintains that whether Broadnax lived at the apartment was a genuine issue of material fact because Ebony Harmon testified that Broadnax did not live there and had stayed overnight only a few times. But Harmon did not live at the apartment and did not have personal knowledge of what happened there every day. Stevens herself conceded that Broadnax registered his home monitoring device at her address for two to three weeks and stayed there during that time, a clear violation of the terms of her lease. Finally, Stevens denies that she ever used drugs at her apartment, but does not dispute that the police found two marijuana blunt roaches on her countertop when they were called there for a domestic dispute involving Broadnax. The presence of illegal drugs in her apartment also violated

the lease, and provided further justification for the later eviction notices. In sum, the district court correctly granted judgment in favor of the defendants on all of Stevens' claims.

AFFIRMED.