# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-1455

ELTON GATES and LUSTER NELSON,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, PHILIP J. CLINE,
JAMES ECHOLS, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 2155—**Ruben Castillo,** *Judge*.

ARGUED APRIL 14, 2009—DECIDED SEPTEMBER 27, 2010

Before KANNE, ROVNER and WOOD, *Circuit Judges*.

ROVNER, *Circuit Judge.* Persons who are arrested by Chicago police officers often are carrying small amounts of cash which the officers seize[1] and inventory at the

---

[1] The plaintiffs say the money was "seized" and the City says it was "recovered." The district court doubted there was any

(continued...)

time of arrest. The plaintiffs here were arrestees from whom police officers confiscated small amounts of cash. The arrestees unsuccessfully sought the return of their money and challenged the City's policies governing the return of seized funds. They also challenged the notice the City provided of those policies. The district court granted summary judgment to the City on the plaintiffs' federal due process claims and dismissed their state law restitution claims as moot. The plaintiffs appeal and we affirm in part, and vacate and remand in part.

## I.

Chicago police officers arrested Elton Gates for aggravated battery, in violation of 720 ILCS 5/12-4(b)(6), and Luster Nelson for manufacture or delivery of crack cocaine in violation of 720 ILCS 570/401(c)(2). The officers seized $113 in cash from Gates at the time of his January 14, 2003 arrest, and $59 from Nelson on

---

[1] (...continued)
difference. *Gates v. Towery*, 507 F.Supp.2d 904, 915 (N.D. Ill. 2007) (hereafter "*Gates II*"). We agree with the district court. The City's position is curious in light of its reliance on 725 ILCS 5/108 *et seq.* as providing adequate procedures for the return of the money. The relevant parts of Section 108 address the "Custody and Disposition of Things *Seized*," 725 ILCS 5/108-2; the "Return to Court of Things *Seized*," 725 ILCS 5/108-10; and the "Disposition of Things *Seized*," 725 ILCS 5/108-11 (emphasis added).

February 4, 2004. Under procedures in place at the Chicago Police Department at that time, each man was issued[2] a property inventory receipt that listed the property seized, a court date, the charges, and the names and star numbers of the police officers effecting the seizures. In each instance, the officer filling out the inventory receipt indicated that the property would be held "for investigation and/or evidence." Although the format of the inventory receipts changed slightly between the time Gates was arrested in 2003 and Nelson was arrested in 2004, one part of the form stayed essentially the same: the right-side column labeled "Notice to Property Owner or Claimant," which we will refer to as the "Notice."[3]

---

[2] Although neither side is precise in describing how the inventory receipt is issued to the arrestee, we gather that the receipt is physically handed directly to the arrestee at the time the property is taken and inventoried. The face of the receipt directs the officer to "give this copy to arrestee."

[3] Both Gates' and Nelson's receipts contain the "Notice to Property Owner or Claimant." Inexplicably, the district court found that Nelson's receipt did not contain the Notice, even though both sides agree, and our review confirms, that Nelson's receipt does in fact contain the Notice. *See Gates II*, 507 F.Supp.2d at 911 n.2. We can only assume the district court was viewing some other version of the receipt. At oral argument, the City explained that the copy of the inventory receipt provided to the state court judge differed from the form provided to the arrestee. It is possible that the district court judge was viewing the copy normally given to the state

(continued...)

In relevant part, the Notice states:[4]

Property Release Order (CPD-34.554) Required

Return to the police station where your property was taken from you. Give this copy to the desk officer in charge for forms and instructions necessary for the return of your property.

Upon official notification that inventoried property is available for release, the subject owner or claimant must pick up the property within 30 days of notification or the property will be legally disposed of according to the direction of the law.

* * * *

---

[3] (...continued)
court judge and that the Notice was omitted from that copy. This is but one instance of the confused state of the record, and it is a significant one; it would be impossible for the district court to judge the adequacy of notice when the substance of the notice was uncertain.

[4] The Notice is printed almost entirely in all capital letters, except for two citations to Illinois Statutes. Indeed, even the non-Notice parts of the inventory form appear in all capital letters. For ease of reading, we will use a more conventional format. We are also omitting a paragraph in the middle of the Notice which is not relevant to the issues here and which neither side cites. Finally, there is some testimony in the record that there is a box to the left of the "Property Release Order (CPD-34.554) Required" line that officers check when that form is required. The box is not visible on any of the photocopies that appear in the record and no check mark is visible on either plaintiff's form.

Arrestee Information

Seizure without search warrant—(Ill. Rev. Stat. Chap. 38, Sec. 108-2): (725 ILCS 5/108-2)

Give this copy to arrestee. If not accepted, attach to Copy 5.

Seizure with search warrant—(Ill. Rev. Stat. Chap 38, Sec. 108-10) (725 ILCS 5/108-10)

Attach this copy to search warrant.

R. 214-2, Ex.2 ("Gates Receipt") and Ex. 3 ("Nelson Receipt").[5]

Gates later pled guilty to aggravated battery of a police officer and was sentenced to two years' probation. After unsuccessfully seeking the return of his $113, Gates filed a class action law suit against the City of Chicago, the Superintendent of the Police Department (then Philip Cline, and now Jody Weis), and the officers involved in his arrest.[6] Gates alleged that the notice given on the inventory receipt was misleading because it advised arrestees that they would be notified when

---

[5] There is one minor difference. The sentence reading, "If not accepted, attach to Copy 5," appears on the form for Gates but is absent from the form for Nelson. This sentence is irrelevant to the issues presented on appeal and is not cited by either side.

[6] The plaintiffs do not appeal the judgment granted in favor of the individual defendants. We will refer to the remaining defendant as "the City."

their property was available for release but the City
never sends such a notice and he did not receive one.
He also alleged that he went to the City of Chicago's
Evidence and Recovered Property Section ("ERPS")
several times between July 2003 and February 2004,
each time demanding the return of his money. On each
occasion, he was told by a Chicago police officer that
he could not retrieve his property unless he secured a
signed release from the arresting officer. Gates asserted
that he repeatedly attempted to secure a signed release
from the arresting officers but was told every time that
the officers were not available and that no one else
could authorize the release of his property.

The charges against Nelson were dismissed approxi-
mately one month after his arrest. Nelson's experience
seeking the return of his money paralleled that of
Gates. Like Gates, he alleged that he went to ERPS
several times and was told he needed a release order
from the arresting officer before his money would be
returned to him. Like Gates, he sought out the ar-
resting officers on multiple occasions but the officers
were unavailable. He sued the City, the Superintendent
and the arresting officers alleging that the notice on the
inventory receipt was misleading because it indicated
he would be notified when his property was ready
for release even though the City never issues such a
notification and he did not receive one.

Both Gates and Nelson asserted that they were
deprived of their property without due process of law
because: (1) the defendants seized the property and

retained it for months without instituting forfeiture proceedings wherein they could establish their right to the return of their property; (2) the inventory receipt falsely represented that they would be notified when their property was available for release; (3) the defendants continued to retain the property after conclusion of the criminal proceedings even though there was no basis in law or fact to seek forfeiture of the funds at that point; (4) after seizing property without prior judicial authorization, the defendants retained the property without seeking forfeiture or simply returning the property; and (5) the City's policy to retain seized property, to provide a false and misleading inventory receipt, and to refuse to promptly return the property at the conclusion of criminal proceedings is designed to delay the return of non-forfeitable property to its rightful owners. For these alleged violations of 42 U.S.C. § 1983 (hereafter "Section 1983"), both plaintiffs sought the return of their property, unspecified reasonable damages, and an award of costs and reasonable attorneys' fees. The defendants also sought to certify a class of persons arrested after March 23, 2002, from whom the defendants seized property pursuant to the City's policy. Gates and Nelson later added state law claims for conversion, replevin, unjust enrichment and constructive trust, among other things, seeking damages and the return of their money.

Two days after Gates filed suit, the General Counsel to the Superintendent of Police sent a check for $113 to Gates' attorney with a letter offering to pay interest.

Gates' attorney returned the check. Approximately one month after Nelson was added as a plaintiff, the General Counsel sent a check for $59 to counsel for Nelson (both men are represented by the same attorney), also accompanied by a letter offering to pay interest. The plaintiffs' lawyer returned that check as well.

The district court eventually certified two classes of persons who, between March 23, 2002 and December 14, 2004, had property taken from them at the time of their arrests, whose criminal cases had been resolved in the trial court, where no forfeiture action had been initiated and the time for filing a forfeiture action had expired, where the property was not inventoried as evidence in any criminal investigation, where the arrestee was issued an inventory receipt that indicated the arrestee would be notified when the property was available for release, and where the money had not yet been returned to the arrestee. One class consisted of narcotics arrestees and the other class was comprised of persons arrested for offenses not related to narcotics. The defendants petitioned for interlocutory review of the class certification. We granted that petition and affirmed. *See Gates v. Towery*, 430 F.3d 429 (7th Cir. 2005) (hereafter "*Gates I*").

In *Gates I*, we rejected the City's argument that class certification was improper because the case was mooted by the City's offer to return the funds to the named plaintiffs. We agreed with the district court that the claims of the class representatives were not moot because the City's tender to Gates and Nelson was incom-

plete. The plaintiffs sought for themselves (and the class) the return of the seized property, prejudgment interest, compensatory damages for any injury attributable to the loss of the property's use, and compensation for the value of their time spent trying to retrieve their property. We noted that a tender is insufficient unless it makes a plaintiff whole and thus must include filing fees and other costs. 430 F.3d at 431. We also noted that a promise of interest later is not the same as cash today, especially in light of the City's history of delay in making payments. As for compensatory damages, we remarked that a person whose rights have been violated under the due process clause may receive nominal damages if he or she cannot show out-of-pocket loss or other concrete injury. Yet the City offered nothing for fees and costs of filing the suit, nothing for compensatory damages (not even a dollar for nominal damages), and only a promise of interest, to which a "prudent litigant may attach a steep discount," especially because the City denied owing interest but offered to pay it only as a good will gesture. 430 F.3d at 431. To eliminate the controversy and render the case moot, we held that a defendant must meet the plaintiff's demands, which the City here was unwilling to do. To the extent the plaintiffs sought an injunction requiring the City to compensate them for past losses, we remarked that they were on a snipe hunt. "There's no such animal, beyond the equitable remedy of restitution—and the City stands ready to hand over the amounts it seized, in order to avoid unjust enrichment." 430 F.3d at 432. We concluded that Gates and Nelson were adequate

representatives to challenge the City's old policies and practices and that the suit could proceed as a class action.[7]

After we affirmed the class certification, the plaintiffs were granted leave to file a fifth amended complaint. The first three counts were individual and class claims for violations of due process. The remaining counts were grounded in state law and included individual and class claims for conversion, replevin, unjust enrichment, constructive trust, declaratory judgment under the Illinois Uniform Disposition of Unclaimed Property Act ("UDUPA"), and breach of fiduciary duty. For the unjust enrichment, constructive trust, and breach of fiduciary claims (collectively the "restitution claims"), the plaintiffs sought the return of their money. Ultimately, the district court dismissed the restitution claims and denied a request to certify a restitution class because those claims were moot. The court also granted summary judgment in favor of the City on the federal due process claims. The plaintiffs appeal.

## II.

On appeal, the plaintiffs contend that the City was not entitled to summary judgment on the due process claims because the City did not provide meaningful

---

[7] On December 14, 2004, the Chicago Police Department modified the inventory form. The class action here includes only persons arrested before that date, during the time the prior form was in use.

notice of its inventory and property return procedures, and because the City failed to provide adequate procedures for the return of their money. The plaintiffs also challenge the dismissal of their restitution claims and the refusal to certify a restitution class, arguing that the named plaintiffs retained an economic interest in class certification. Our review of all of the issues is *de novo*. *Lobzun v. United States*, 422 F.3d 503, 507 (7th Cir. 2005) (we review *de novo* whether the government's notice procedures complied with due process); *Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 475 (7th Cir. 2010) (we review *de novo* the district court's grant of summary judgment).

**A.**

We begin with the issue of meaningful notice. Both the district court and the parties divide the notice claims into two categories: narcotics arrests and non-narcotics arrests. As the district court noted, state law entitles all arrestees to an inventory of the items seized from them. *See* 725 ILCS 5/108 *et seq*. Section 108-2 provides what is to be done when property is seized without a warrant. 725 ILCS 5/108-2. Section 108-10 provides the procedure when property is taken pursuant to a warrant. 725 ILCS 5/108-10. In each instance, the police officers are required to take an inventory of the items seized, and the person from whom the items were seized is entitled to a copy of that inventory. 725 ILCS 5/108-2 and 725 ILCS 5/108-10. To satisfy this requirement, the City provides arrestees with the property

inventory receipt we describe above, and on each receipt is printed the Notice (quoted *supra* at 4-5) that purports to describe what arrestees should do in order to reclaim their property. The parties seem to agree that thousands of inventory receipts were issued for cash each year during the relevant time period, and the value of cash seized and inventoried was millions of dollars.

Those arrested on narcotics charges receive an additional notice. By virtue of a consent decree entered in an earlier federal suit between an arrestee and the City, *Pollard v. Daley*, Case No. 87 C 2401, narcotics arrestees are entitled to a "*Pollard* Notice," a Claims Letter mailed by the City within ninety days of the arrest, informing the arrestee of the procedure to claim their seized property. Under the terms of the *Pollard* consent decree, narcotics arrestees could retrieve their money by taking the Claims Letter to the ERPS between 8 a.m. and 4 p.m., Monday through Friday. The *Pollard* notice was mailed to narcotics arrestees at the address listed on the inventory receipt, which narcotics arrestees also received. Non-narcotics arrestees received only the inventory receipt we have described.

For both narcotics and non-narcotics arrests, the inventory receipt lists three possible dispositions for seized funds: (1) "hold for investigation and/or evidence," in which case the name and star number of the investigating officer are listed; (2) "property owner notified . . . to pick up property within 30 days or property will be disposed of"; or (3) "to be disposed of by custodian (not to be returned)." For both Gates and Nelson, the officers

completing the form checked the "hold for investiga-tion and/or evidence" box, even though the money taken from them was soon deposited into bank accounts (the City has one account for narcotics arrests and another for non-narcotics arrests) where it was co-mingled with other funds and thus lost any forensic value as evidence. Moreover, in each case, the arresting officers engaged in no further investigation related to the money seized.

The City acknowledges that when the "hold for investi-gation" box is checked in non-narcotics cases, the money seized will not be made immediately available to the arrestee even if the arrestee follows the instructions (such as they are) in the Notice. However, nothing on the inventory receipt notifies arrestees in this category of this fact, and the Notice gives the arrestee no clue as to what additional steps he must take in order to reclaim his property. According to the City, an arrestee in the non-narcotics category may retrieve seized funds in one of two ways. He may present to the ERPS either a criminal court order stating that the funds may be released (a "Section 108 Order") or a completed Property Release Order (CPD-34.554), which is known in the police department as a "Form 54." To obtain a com-pleted Form 54, an arrestee must return to the district of arrest and present the inventory receipt to the desk sergeant, who, in turn, will attempt to connect the arrestee with the arresting officer. Only the arresting officer can certify on a Form 54 that the property is no longer needed for investigation or evidence. Both plaintiffs were told they needed a signed Form 54 and

both tried repeatedly to contact their arresting officers and were unable to do so. A Section 108 order may be issued by the judge presiding over the arrestees' criminal case. The City presumes the arrestee must request the order by filing a motion in the criminal case, characterizing the request as a *de minimis* burden. The City does not describe how an arrestee may obtain a Section 108 order when no criminal charges are filed or when the charges are quickly dropped.

For narcotics arrests, the process is more complicated. As we noted, narcotics arrestees receive both an inventory receipt and, in theory, a *Pollard* notice. The Asset Forfeiture Unit ("Unit") of the Police Department mails the latter to the address listed for the arrestee on the inventory receipt, even though many arrestees will surely not be home when the *Pollard* notice arrives because a predictable percentage of them will not be released on bail and instead will be detained in jail pending trial. The Unit mails *Pollard* notices only when the amount seized is less than $1000, the City has declined to seek forfeiture (and the City automatically declines to seek forfeiture when the amount is less than $130), and the money is available to be returned to the arrestee. As with non-narcotics arrestees, when the "hold for investigation box" is checked, the money will not be returned immediately to the arrestee even if he follows the instructions in the Notice. According to the City, narcotics arrestees may reclaim their funds by presenting to the ERPS proper identification and either the *Pollard* notice, a notice from the State's Attorney's Office following settlement of any forfeiture action, or

an order from the asset forfeiture court stating that the funds may be released. The plaintiffs asserted that narcotics arrestees could retrieve their funds only by presenting proper identification, the *Pollard* notice and either an order from the asset forfeiture court or a completed Form 54. The City concedes it will not honor a Section 108 order in a narcotics case in the absence of a *Pollard* notice, a letter from the state's attorney or an order from an asset forfeiture court. On summary judgment, we accept the version of the facts supplied by the party opposing judgment, so we will assume that narcotics arrestees were required to present the *Pollard* notice and an additional document in order to claim their money. The plain language on the face of the Notice supports this claim; it declares without qualification that Form 54 is "required."

We turn, then, to whether the notice given to the plaintiffs was adequate to satisfy due process concerns. Both plaintiffs contend that the notice given on the inventory receipt is misleading and therefore inadequate. Both contend that the form lulls the recipient into waiting for an official notice that never comes instead of describing the City's actual procedures. Nelson does not challenge the contents of the *Pollard* notice sent to narcotics arrestees but protests that the City failed to make reasonable efforts to deliver the *Pollard* notice to affected arrestees. Nelson, a narcotics arrestee, did not receive the *Pollard* notice due to him and therefore had only the Notice on the inventory receipt to guide him. We will therefore begin with the notice given on the inventory receipt, which was given to all arrestees from whom money was seized.

**1.**

The City contends that the Notice on the inventory receipt is adequate under *City of West Covina v. Perkins*, 525 U.S. 234 (1999). In *West Covina*, the Court considered "whether the Constitution requires a State or its local entities to give detailed and specific instructions or advice to owners who seek return of property lawfully seized but no longer needed for police investigation or criminal prosecution." 525 U.S. at 236. The property involved was seized from a home during execution of a valid search warrant. The police officers executing the warrant seized photographs, guns, ammunition and cash. They left the home's occupants a form titled, "Search Warrant: Notice of Service" (hereafter "Warrant Notice"), along with an itemized list of the property seized. 525 U.S. at 236. In its entirety, the Warrant Notice read:

> TO WHOM IT MAY CONCERN:
>
> 1. THESE PREMISES HAVE BEEN SEARCHED BY PEACE OFFICERS OF THE (name of searching agency) *West Covina Police* DEPARTMENT PURSUANT TO A SEARCH WARRANT ISSUED ON (date) *5-20-93*, BY THE HONORABLE (name of magistrate) *Dan Oki*, JUDGE OF THE SUPERIOR/<u>MUNICIPAL</u> COURT, *Citrus* JUDICIAL DISTRICT.
>
> 2. THE SEARCH WAS CONDUCTED ON (date) *5-21-93*. A LIST OF THE PROPERTY SEIZED PURSU-ANT TO THE SEARCH WARRANT IS ATTACHED.
>
> 3. IF YOU WISH FURTHER INFORMATION, YOU MAY CONTACT:

(name of investigator) *Det. Ferrari or Det. Melnyk* AT [telephone number].

LT. SCHIMANSKI [telephone number].

525 U.S. at 236-37. Although the officers did not leave the warrant number, that information was available in a public index. Shortly after the search, Perkins, the property owner, called one of the detectives listed on the Warrant Notice seeking the return of the seized items. The detective told him that he would need to obtain a court order authorizing the return of the property. 525 U.S. at 237. Perkins then went to the courthouse and attempted to see the judge who issued the warrant. When he learned that the judge was on vacation, he tried to ask another judge to release his property but was told the court had nothing under Perkins' name.

Perkins then filed suit against West Covina and the officers who seized his property, alleging violations of the Fourth Amendment. The district court granted summary judgment to West Covina and its officers but invited supplemental briefing on whether the available remedies for the return of seized property were adequate to satisfy due process. *West Covina*, 525 U.S. at 238. The district court subsequently found that the remedies provided by California law for the return of seized property satisfied due process. The court of appeals reversed. Although the appellate court agreed that state law provided adequate procedures for the return of the property, the court found that West Covina was required to give property owners notice of state procedures for the return of property and also the information needed to

invoke those procedures, including the warrant number. 525 U.S. at 238-39. The court of appeals detailed the information that should have been provided to the property owner, including: the fact of and date of the search, the agency conducting the search, the date of the warrant, the issuing judge, the court where that judge served, persons to be contacted for further information, the procedure for contesting the seizure or retention of property taken, along with any information needed to initiate that procedure, and notice that the owner must file a written motion or request to the court stating why the property should be returned. 525 U.S. at 239.

The Supreme Court rejected this expansive requirement. Perkins acknowledged receipt of a notice that his property had been seized and an inventory of that property. Unlike the plaintiffs here, Perkins raised no independent challenge to the adequacy of state law remedies for the return of his property. Rather, Perkins contended that West Covina deprived him of due process by failing to provide him *notice* of the available state law remedies and the factual information needed to invoke them. The Court held that "[w]hen the police seize property for a criminal investigation, however, due process does not require them to provide the owner with notice of state-law remedies." *West Covina*, 525 U.S. at 240. The primary purpose of the notice required by the Due Process Clause, the Court noted, is to ensure the opportunity for a meaningful hearing. Therefore, due process requires officers seizing property to "take reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its return." 525 U.S. at 240.

No similar rationale justifies requiring individualized notice of state-law remedies which, like those at issue here, are established by published, generally available state statutes and case law. Once the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him. The City need not take other steps to inform him of his options.

525 U.S. at 241.

The Court found that its holding in *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1 (1978), was not to the contrary. In *Memphis Light*, the Court held that when a public utility wishes to terminate service for non-payment, the utility must provide the customer with an opportunity to discuss any billing dispute with a person who has authority to resolve the dispute before terminating the service. 436 U.S. at 16-17. Because the internal administrative procedures for resolving billing disputes were not described in any publicly available document, the Court also held that due process required the utility to inform the customer of the availability and general contours of those procedures. 436 U.S. at 13-15. In *West Covina*, the Court read *Memphis Light* to require notice of the procedures for protecting one's property interest "when those procedures are arcane and are not set forth in documents accessible to the public." *West Covina*, 525 U.S. at 242. *Memphis Light* did not, however, support a general rule that notice of remedies and procedures is required. When state law

remedies are established by published, generally available state statutes and case law, no individualized notice of those procedures is required. *West Covina*, 525 U.S. at 241. The Appendix to the Opinion of the Court in *West Covina* contains a list of federal and state laws governing the execution of search warrants and the return of seized property. 525 U.S. at 244-45. Among the laws listed is 725 ILCS 5/108-10, which is one of the statutes listed in the Notice issued to both Nelson and Gates when their property was seized. Section 108-10 addresses the return of property taken pursuant to a warrant. Section 108-2, also listed on the inventory receipt, relates to the custody and disposition of things seized without a warrant, the situation in the instant case. Unlike *West Covina*, the money seized from Gates and Nelson was taken without a warrant during an inventory search incident to arrest. As we note below, the City relies on Section 108-1 for authority to search for and seize at the time of arrest the proceeds of a crime, articles used in the crime and similar items. We will assume for the purposes of our discussion below that *West Covina* is not distinguishable simply because the money was seized without a warrant. We reserve that decision for a case where it is presented and argued.

Under *West Covina*, the City was not obliged to give Gates and Nelson individualized notice of any publicly available state law remedies for the return of their property, and thus had no obligation to direct the arrestees to Section 108, if Section 108 is in fact an available remedy. The City was obliged by statute to inform the arrestees of the fact of the seizure and to provide an

inventory of the items seized. That they did. Although *West Covina* controls as to the procedures set forth in state statutes, it does not control as to the City's additional difficult-to-access police department rules. In addition to the Section 108 order, the City appears to require additional documents not prescribed by any state statute. Because the City's additional procedures and requirements are not readily accessible to the public, *Memphis Light* rather than *West Covina* controls, and the City must provide notice of the procedures.

In addition to obtaining a Section 108 order, the City required arrestees to take steps in addition to or in lieu of that state law remedy if they hoped to get their money back. The City concedes it would not honor a Section 108 order in the case of a narcotics arrest and in certain non-narcotics cases, such as gambling and prostitution, that might also involve forfeiture. According to the City, non-narcotics arrestees required the inventory receipt, proper identification and either a Form 54 or a Section 108 order in order to retrieve their money. Narcotics arrestees were required to produce the inventory receipt, proper identification, a Form 54 or Section 108 order, and either a *Pollard* notice, an order from an asset forfeiture court or a letter from the state's attorney's office. Both plaintiffs were told they needed the Form 54 and the desk officers did not mention Section 108 when the plaintiffs tried to reclaim their property. Although the state statutes make no mention of "CPD-34.554," the Form 54 as it is called in the police department, the first line of the Notice states, "Property Release Order (CPD-34.554) Required." The Form 54 is "[r]equired" according to the Notice, even

though in certain instances it simply would not be signed by the arresting officer.[8]

The procedures the police department actually employed are not available in documents that are published and generally available. The procedures described in the plaintiffs' testimony (which we are obliged to credit at this stage of the proceedings) are revealed nowhere except possibly in the Police Department's General Orders. The district court found that the General Orders were published and generally available because they are apparently accessible during monthly police board meetings. *Gates II*, 507 F.Supp.2d at 916-17. General Orders, which are written as guides for police officers, are not "published and generally available" in the same sense that publicly enacted laws are published and generally available. Rather, they are "arcane and are not set forth in documents accessible to the public." *West Covina*, 525 U.S. at 242. An arrestee would have to know that the General Orders exist, know that they contain infor-

---

[8]  One of the Rule 30(b)(6) witnesses for the City pointed out that there is a box to the left of the line requiring the Form 54. That witness testified that the Form 54 is required only when that box is checked. The photocopies of the Notice are faint and the box is not visible on this court's copies of the document. Moreover, the Notice is arranged in such a way that a person may not realize that the two paragraphs following the Form 54 statement do not apply unless that box is checked. Finally, the record is unclear regarding whether the box was checked on either plaintiff's inventory form, but both plaintiffs were told that Form 54 releases were required to retrieve their money.

mation regarding the recovery of money seized during arrest, know where and when to find them, and then be able to discern from documents intended to guide police officers what they as arrestees should do to recover their money.[9] This is clearly distinguishable from the published, generally available statutes, and thus *West Covina* does not control the outcome. Because the procedures were arcane and not generally available, under *Memphis Light*, the City was thus obliged to tell arrestees how to get their money back.

The Notice given to arrestees with the inventory receipt does not adequately inform arrestees of the pro-

---

[9] Although it is not part of the record, we found a recent newspaper article regarding the General Orders enlightening. Apparently, the General Orders are due for a major overhaul meant to reduce the volume, remove obsolete rules and add clarity. *See* "First Time in 40 Years: Cops' Rule Book Gets a Makeover: 'It's a mess.' 16-inch stack to be thinned down." http://www.suntimes.com/news/metro/2100601,CST-NWS-cop rules14.article (last visited September 22, 2010). "It's a mess," is a quote from the Department's director of police research and development division. A sergeant who uses the General Orders every day stated, "You read these general orders and your eyes start bleeding. They're so boring." A police and civilian team aims to reduce the size of the 16-inch stack of orders by two-thirds, according to the article. The banality of the General Orders and the ennui they induce in readers are not at issue here, of course. The problem with using the General Orders as notice of the procedures for reclaiming seized funds is that they are not generally available to the public in the same sense as published statutes. They are more like the arcane rules referenced in *Memphis Light*.

cedures to retrieve their money and thus does not comport with due process. After our review of the record, the City's procedures for arrestees to reclaim their cash remain unclear. When the plaintiffs followed the directive to return to the police station for forms and instructions to reclaim their property, they were told they needed the Form 54 but the desk officers did not mention Section 108 orders, orders from asset forfeiture courts or letters from the state's attorney's office. The City's Notice did not inform arrestees of the internal police department procedures which appear to have actually governed the procedure for the return of property seized during an arrest. Nothing on the Notice informed non-narcotics arrestees that they would require the inventory receipt, proper identification and either a Form 54 or a Section 108 order. Nothing on the Notice informs narcotics arrestees that they will require the inventory receipt, proper identification, a Form 54 or Section 108 order, and either a *Pollard* notice, an order from an asset forfeiture court or a letter from the state's attorney's office.

Nothing on the Notice tells arrestees that if the "hold for investigation and/or evidence" box is checked, the subsequent instructions to return to the police station with the inventory form will be inefficacious, at least until the criminal case has concluded and the time for forfeiture has expired. Under those circumstances, following the instructions on the receipt by seeking the signature of an arresting officer on a Form 54 Property Release Order is a futile pursuit because the property will not be available for immediate release. The Notice

also indicates that "official notification" that the property is available for release will be forthcoming even though the City never issues such a notice, even in cases where it determines that the property is not subject to forfeiture and is not necessary for investigation or evidentiary purposes. Although the City was not obliged to inform arrestees about publicly published state law remedies, the City may not mislead arrestees about the necessary procedures for the return of their money or lull them into passively waiting for official notification. On this record, it appears the City's instructions were a model of misdirection. Although published state statutes qualify as being readily available to the public, documents that are available at a monthly Police Board Meeting, although technically available to the public in a limited way, cannot satisfy due process notice requirements. Summary judgment in favor of the City on the issue of notice sufficient to satisfy due process was premature given that the Notice provided misleading and incomplete information.

**2.**

For narcotics arrestees, there is an additional due process notice issue. According to Nelson, the *Pollard* notice is mailed to the address listed on the inventory receipt. This address is provided by the arrestee at the time of the arrest. Nelson challenges whether mailing this notice to the address given on the inventory receipt satisfies the requirements of due process. He contends that a predictable percentage of arrestees will not be

able to make bail and will be in jail at the time the *Pollard* notice is mailed to their last home address. The City is well aware that some arrestees will not be found at home because the City itself delivers the arrestees to the jail. Nelson argues that, before sending the *Pollard* notice, the City should take the additional step of checking the website of the Sheriff's Department to determine if the arrestee is in jail, and if so, deliver the *Pollard* notice to the arrestee in jail. Nelson also argues that, if the City uses the address listed on the inventory receipt in the first instance, the City is obliged to take the additional step of checking the Sheriff's website to determine if the arrestee is at the jail and forward the notice there if the first *Pollard* notice is returned to the City as undelivered.

Due process requires, at a minimum, that "deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). That notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314. The question here is whether notice initially sent to the home address of arrestees, a number of whom predictably remain in custody, is reasonably calculated to reach them. There is a risk (which we cannot quantify on this record) that incarcerated persons will never see notices that were sent to their homes, in some cases because the notice will be returned as undeliverable and in other cases

because other persons living in the home will not forward the notice to an incarcerated arrestee. A related question is whether mailings returned by the post office require a check of the Sheriff's website and a possible second mailing under the *Mullane* standard. The plaintiffs point out that there is some agreement between the parties on the basic principles at play. The plaintiffs agree that the notice need not actually reach its intended target so long as it is reasonably calculated to do so. *Dusenbery v. United States*, 534 U.S. 161 (2002) (actual notice is not required so long as the chosen method of giving notice is reasonably certain to inform those affected); *Ho v. Donovan*, 569 F.3d 677, 680 (7th Cir. 2009) (same). The defendants agree that a notice may not be sent to the arrestee's home if the City affirmatively knows the arrestee is in jail because such a mailing is not reasonably calculated to reach the intended target. *Robinson v. Hanrahan*, 409 U.S. 38, 39 (1972) (where the State mails a vehicle forfeiture notice to the address where the vehicle is registered even though the State knows the target of the mailing was not at that address and also knows he will not be able to get to that address because he is confined in jail, that notice was not reasonably calculated to apprise the vehicle owner of the pendency of the forfeiture proceedings). Nelson notes that, in narcotics cases where criminal proceedings have been initiated against the arrestee whose property has been seized, the City is aware of a significant possibility that the arrestee is in state custody and will not be at home to receive the *Pollard* notice. Nelson acknowledges that not all arrestees are in jail at the time the

*Pollard* notice is mailed, and thus concedes that the City cannot know the arrestee's whereabouts without inquiry, but contends the City can easily check the Sheriff's website to determine if the arrestee is incarcerated before sending the notice. At the very least, Nelson asserts, the City should be required to check the Sheriff's website if the first attempted mailing is returned as undelivered. If the arrestee is in jail, the City should be required to mail the *Pollard* notice to the jail, Nelson posits.

*Mullane* specifies that the means of delivery "employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." The purpose of notice under the Due Process Clause is to apprise interested parties of the pendency of an action that might deprive them of their property and afford them an opportunity to present their objections. The purpose of the *Pollard* notice is to inform the owner that forfeiture will not be sought and that the funds are available to be returned to the owner. But if the owner fails to reclaim property within a certain number of days after receiving notice of its release, the inventory receipt Notice warns that the "property will be legally disposed of according to the direction of law." The *Pollard* notice is not the only notice relating to property seizure received by narcotics arrestees. Narcotics arrestees also receive the inventory receipt, which contains its own Notice regarding how to proceed when property has been seized at the time of arrest. That Notice is handed to the arrestee at the time of the arrest, but as we noted above, that Notice is not adequate on this record

to apprise narcotics arrestees of the procedures neces-
sary to reclaim their money. Moreover, the *Pollard* notice
is more than just a notice; it is a document required to
retrieve the property that has been seized. The City
has conceded that it will not release the property in a
narcotics case unless the arrestee presents the *Pollard*
notice, an order from an asset forfeiture court or a letter
from the state's attorney's office. In a case where the
City decides not to seek forfeiture, there will be no
order from an asset forfeiture court and no letter from
the state's attorney's office settling the forfeiture. The
*Pollard* notice then becomes the most important vehicle,
if not the only vehicle, for the arrestee to reclaim
his money.

The record does not tell us the cost to the City of
checking the Sheriff's website before mailing the
*Pollard* notice, or the cost of checking it only after a
notice has been returned as undelivered. It is the City's
burden to demonstrate that the notice provided is ade-
quate for the purposes of due process. *Whiting v. United
States*, 231 F.3d 70, 77 (1st Cir. 2000) (the government
must show, if the issue is contested, that the notice
was mailed to the prison in which the claimant was in
fact being held). Generally, written notice mailed to the
claimant's residence satisfies due process even if the
notice is not actually received. *Krecioch v. United States*,
221 F.3d 976, 980 (7th Cir. 2000). At the same time, due
process is not satisfied if the notifying party knew or
had reason to know that notice would be ineffective.
*Garcia v. Meza*, 235 F.3d 287, 290 (7th Cir. 2000); *Krecioch*,
221 F.3d at 980. Given that the City knows that some

arrestees will be in jail when the *Pollard* notice is mailed, we are reluctant to find as a matter of law that notice mailed to the home of the arrestee satisfies the *Mullane* standard, especially in cases where the notice is returned as undelivered. At that point, the City's general knowledge that some arrestees will be in jail becomes more specific: *this* arrestee is quite possibly in jail.[10] *Kreicioch*, 221 F.3d at 980-81 (the government violates due process when it purposely mails notice of forfeiture to the claimant's residence knowing that the claimant is incarcerated or in federal custody). "A reasonable person presented with a letter that has been returned to sender will ordinarily attempt to resend it if it is practicable to do so." *Small v. United States*, 136 F.3d 1334, 1337 (D.C. Cir. 1998). A person "desirous of actually informing" the arrestee would likely take that second step and check the Sheriff's website. *Small*, 136 F.3d at 1337 (when the government knows, or can easily ascertain, where a person may be found, it must direct its notice there, and not to some other address where the designee formerly resided). Although the City complains that the Sheriff's website contains a dis-

---

[10] There are a number of reasons, of course, that a notice might be returned as undeliverable. The arrestee may have moved, or may have given a false address in the first place. The question here is whether the notice is reasonably calculated to reach the target. When the sender of the notice has itself delivered the intended recipient to jail, jail is certainly one of the likeliest places to find that target if mail sent to the home address is returned by the post office.

claimer regarding the accuracy of the data on the site, the use of that site to locate the arrestee would likely satisfy the City's duty to reasonably attempt delivery given the City's awareness that some percentage of arrestees will not be home to receive the notices but will be in custody. As even the plaintiffs concede, actual notice is not necessary if the City takes steps that are "reasonably calculated" to provide the notice. On this record, we cannot say that mailing only to the address given at the time of arrest is adequate for due process purposes when the City has available a seemingly low-cost option for locating arrestees likely to be in jail. *See Krecioch*, 221 F.3d at 980 (when a claimant is incarcerated or in government custody, the ease of learning the claimant's location makes it in most cases unreasonable for the forfeiting agency to fail to ascertain the location of one it knows to be in government custody). "Of course, if sending the letter again would require an 'impracticable and extended search' for its addressee, *Mullane*, 339 U.S. at 317, 70 S.Ct. at 659, then a reasonable person would not try again, and due process does not require another attempt." *Small*, 136 F. 3d at 1337. *See also Lobzun*, 422 F.3d at 507 (although there is no *per se* rule imposing an affirmative duty on the government to seek out claimants in each case where the initial notice is returned undelivered, the court must decide on a case-specific basis whether the *Mullane* standard is met, considering all of the circumstances of each case to determine whether the notice provided is reasonably calculated to apprise the claimant of pending proceedings). Our court has de-

clined to adopt a *per se* rule that examines notice only at the time it was sent and ignores subsequent events. *Garcia*, 235 F.3d at 291. At the same time,

> we also decline to impose an affirmative duty upon the government to seek out claimants in each case where its initial notice is returned undelivered or to require actual notice in every case. Instead, we believe the correct approach is a fact-specific analysis under the due process standard set forth by the Supreme Court in *Mullane*, which requires us to consider all the circumstances of each case to determine whether the notice provided is reasonably calculated to apprise the claimant of the impending proceeding.

*Garcia*, 235 F.3d at 291. The plaintiffs claim that forty percent of *Pollard* notices mailed are returned to the police department undelivered. The City does not wish to bear the expense of the additional search of the Sheriff's website and a possible second mailing because the amounts at issue are so small. But the City expects claimants to repeatedly return to the police station for instructions and for the elusive hunt for the arresting officer's signature on the Form 54, in order to reclaim those same small amounts. And the *Pollard* letter is not simply notice but also the means by which arrestees may reclaim their money. The predictable result is that millions of dollars remain unclaimed in the City's coffers each year. We cannot conclude on this record that arrestees are willingly abandoning millions of dollars; it is just as likely that they do not claim their money

because they do not know how or because they have not received a *Pollard* notice or because the City has made the process obtuse and unreasonably difficult. It is more likely that arrestees do not know how to retrieve their money because the City's notice is misleading and, in a certain class of cases, is not reasonably calculated to reach its target. The district court was premature in holding that the inventory receipt Notice was adequate, and in finding that no more than the initial *Pollard* mailing to the address listed on the inventory receipt was required for narcotics arrestees. The court should also have considered the City's knowledge that a predictable number of arrestees would not be home, and should have weighed the practicability of checking the Sheriff's website and making a second mailing.

**B.**

Before we proceed to the merits of the inadequate procedures issue, we must address the City's contention that the plaintiffs waived any claim that they were entitled to prompt post-deprivation hearings by not raising this issue in the district court. The plaintiffs made clear several times in the district court that their due process claim encompassed both a lack of notice about the procedures for the return of their property and the inadequacy of the procedures themselves. In part, the plaintiffs argued that the City failed to establish its right to continue to detain their property through a post-deprivation hearing and yet also would not

return their property. *See, e.g.*, R. 17, at 2 ("Fourth, Defendants violate the Fourth Amendment by seizing and detaining property without securing a post-seizure finding of probable cause to detain it."); *Id*. at 6 ("[I]t is important to note the dual aspects of Plaintiffs' procedural due process claim. The first . . . is a constitutionally defective notice. The second aspect of the procedural due process claim relates to Defendants' failure to offer a constitutionally permissible administrative remedy."); R. 317-1, at 10-11 (noting the dual aspects of the due process claim, and also noting that the "City nevertheless retains the inventoried cash, fails to send notice the property is available for pick up, and never seeks judicial approval of its continued detention of the property."). We understand the plaintiffs' argument to be that they were entitled to the immediate return of their money at the conclusion of the criminal cases against them and after the time for forfeiture had passed because the City failed to establish any right to continue holding the money. The City failed to establish a right to detain the money in part because there was no prompt post-deprivation hearing. The plaintiffs have not sought a prompt post-deprivation hearing as a remedy but rather argued that they were entitled to get their money back in the absence of any such hearing. The City does not seem to deny that it had no claim on the plaintiffs' property after the conclusion of the criminal cases and after the time for seeking forfeiture expired, and in fact contends that it never "seized" the plaintiffs' property at all but merely "recovered" it, a contention that is consistent with the plaintiffs' claim. The plain-

tiffs' argument regarding a prompt post-deprivation hearing, although not always clearly expressed, is simply part of their larger argument that the procedures for the return of their money were inadequate, an issue which they clearly preserved. We will therefore proceed to the merits of the issue.

We have already concluded that notice of the procedures for reclaiming seized money may be inadequate and that the district court was premature in granting judgment in favor of the City on that point. We now consider whether the process itself was adequate to satisfy the Constitution. The record is replete with factual disputes about what the City requires of arrestees seeking return of their money and whether the City's stated procedures and remedies are actually available to arrestees. Gates and Nelson contend that the City's procedure was illusory and that the signed Form 54 was essentially unobtainable. They complain that the City has improperly inverted the burden of proof in requiring arrestees to obtain orders proving their entitlement to their money. If the City wishes to retain the money following the conclusion of criminal proceedings, Gates and Nelson contend, then the City must seek judicial authorization allowing the City to do so. The City cites Sections 108-2, 108-10 and 108-11 as providing an available state statutory process and argues that the burden on arrestees of requesting a criminal court order releasing inventoried property is *de minimis*. The City also cites Section 108-1 as authority for seizing the money in the first place.

Section 108-1 provides in relevant part:

> Search without warrant. (1) When a lawful arrest is effected a peace officer may reasonably search the person arrested and the area within such person's immediate presence for the purpose of:
>
> (a) Protecting the officer from attack; or
>
> (b) Preventing the person from escaping; or
>
> (c) Discovering the fruits of the crime; or
>
> (d) Discovering any instruments, articles, or things which may have been used in the commission of, or which may constitute evidence of, an offense.

725 ILCS 5/108-1. The City argues that Section 108-1 allows officers to search arrestees for fruits of the crime, or items that constitute evidence of the crime or items that were used in committing the crime. Releasing such property before the State has decided whether to use it as evidence or the criminal court has released it would contravene these purposes, the City argues. To ensure that property is not released prematurely, the City reasons that it may require arrestees to present either a court order or a Form 54 executed by the arresting officer. The plaintiffs, however, are not seeking return of their funds during the pendency of criminal proceedings. The class consists of arrestees whose criminal cases have concluded and for whom the time for forfeiture has expired. But the relevance of Section 108-1 as a source of authority for holding the property is questionable once the criminal cases are concluded. At that point, the City is essentially arguing that it was entitled to shift to

the arrestee the administrative burden of keeping track of whether the money was still needed in a prosecution.

Recall that Section 108-2 provides what is to be done when property is seized without a warrant. In that instance:

> An inventory of all instruments, articles or things seized on a search without warrant shall be given to the person arrested and a copy thereof delivered to the judge before whom the person arrested is taken, and thereafter, such instruments, articles or things shall be handled and disposed of in accordance with Sections 108-11 and 108-12 of this Code. *If the person arrested is released without a charge being preferred against him all instruments, articles or things seized, other than contraband, shall be returned to him upon release.*

725 ILCS 5/108-2 (emphasis added). Section 108-10 provides the procedure when property is taken pursuant to a warrant:

> A return of all instruments, articles or things seized shall be made without unnecessary delay before the judge issuing the warrant or before any judge named in the warrant or before any court of competent jurisdiction. An inventory of any instruments, articles or things seized shall be filed with the return and signed under oath by the officer or person executing the warrant. The judge shall upon request deliver a copy of the inventory to the person from whom or from whose premises the instruments, articles or things were taken and to the applicant for the warrant.

725 ILCS 5/108-10. In each instance here, the money was seized without a warrant and so Section 108-2 applies. Section 108-2, in turn, directs the court to Section 108-11 and 108-12. Section 108-12 addresses the disposal of obscene material and is not relevant here. Section 108-11 provides:

> The court before which the instruments, articles or things are returned shall enter an order providing for their custody pending further proceedings.

725 ILCS 5/108-11.

The City envisions that the court will enter an order in each case involving a seizure of property. The plaintiffs do not dispute that a court could, in theory, enter such an order. But they contend that the statute does not require a court to do so, that courts generally are reluctant to take that step, and that in any case, the City does not accept such an order as sufficient to secure the release of funds. If money seized is potentially subject to forfeiture, as it may be in narcotics cases or certain other cases,[11] the City admits it will not release the money even if the arrestee presents a court order issued under Section 108 (if an arrestee manages to procure such an order, which Gates and Nelson claim is difficult to impossible). In that instance, the City additionally requires an order from an asset forfeiture court or a *Pollard* release letter from the Asset Forfeiture Unit

---

[11] The City claims to seek forfeiture in certain cases involving prostitution and gambling in addition to certain narcotics cases.

or a letter from the state's attorney's office indicating any forfeiture has been settled even when the time for applying for forfeiture has passed and even when the City has decided as a matter of policy not to seek forfeiture in cases involving small amounts of money. As we noted, the plaintiffs have also testified that the City also requires a signed Form 54 in possible asset forfeiture cases as well as in all other cases, a requirement stated on the face of the Notice.

Gates and Nelson contend that criminal court judges routinely refuse to enter Section 108 orders and that the provision is therefore not an available remedy. The arguments of both the plaintiffs and the City on this issue are moving targets, but we see a number of potential problems with the City's argument regarding Section 108. Although Section 108 might provide a means for arrestees to reclaim money that the City has held past the point of any legitimate right to retain it, the plaintiffs' real complaint is that the City has a policy of routinely putting arrestees to the burden of that remedy in the first place. The plaintiffs' first point of contention with the City's policy is that it requires arrestees to provide anything other than the inventory receipt and proper identification to collect their money at the conclusion of their criminal cases. Once the time for forfeiture has passed and it is clear the City has no entitlement to the money, the plaintiffs maintain that there is no constitutionally permissible reason to require arrestees to procure a court order to reclaim what is rightfully theirs. The City nonetheless insists upon the Section 108 order because it wishes to verify that the

criminal case is indeed over, that the money is no longer needed as evidence, and that forfeiture is no longer an issue. In requiring the order, Gates and Nelson contend, the City shifts to arrestees the administrative burden of proving entitlement to their money and retains the money past any legitimate time frame as a matter of official policy.

The question with respect to Section 108 is whether the City or the arrestee should be held to the burden of seeking a Section 108 order. In cases where the money is legitimately needed as evidence or might be subject to forfeiture, the City or the prosecutor can ask the court to enter a Section 108 order "providing for [its] custody pending further proceedings." 725 ILCS 5/108-11. In cases where the criminal case has concluded and the time for forfeiture has expired, an arrestee may ask the court to release the funds. The plaintiffs contend they should not be put to this task and the City contends it is a *de minimis* burden. The plaintiffs also presented evidence that criminal courts are reluctant to issue Section 108 orders unless the arrestee can demonstrate that forfeiture will not be sought, placing arrestees in a classic Catch-22 because the alleged purpose of re-quiring the Section 108 order is to demonstrate to the City that forfeiture is no longer an issue.

In arguing that the City's procedures requiring a Section 108 order or a Form 54 do not comport with due process, the plaintiffs cite to a line of cases from the Second Circuit involving the procedures for arrestees to recover their property in the City of New York. *See*

*McClendon v. Rosetti*, 460 F.2d 111 (2d Cir. 1972); *Butler v. Castro*, 896 F.2d 698 (2d Cir. 1990); *Alexandre v. Cortes*, 140 F.3d 406 (2d Cir. 1998). The plaintiffs in *McClendon*, like the plaintiffs here, had been arrested and had property taken from them at the time of their arrests. Pursuant to a municipal ordinance, that property was delivered to the Police Property Clerk of New York ("Property Clerk") by the arresting officers or by the Department of Corrections. In each person's case, criminal proceedings had been terminated either by dismissal or conviction of a crime unrelated to the property. The District Attorney had in each instance supplied a release certifying that the property was no longer needed as evidence in any case and that the District Attorney had no objection to its release. Each plaintiff made a timely demand for the return of his or her property and each was told that they must file a civil suit. The parties agreed that the part of the ordinance giving a judge the authority to direct the return of the property was not a meaningful remedy because almost no criminal court judge would order such a return. The court held that, beyond certain deficiencies of notice,

> the ordinance is fatally deficient in other terms of due process. The burden of proof in any civil action is expressly put upon the claimant "from whose possession such property or money was taken or obtained, or any other claimant" to "establish that he has a lawful title or property right in such property or money and lawfully obtained possession thereof and that such property or money was held and used in a lawful manner." New York, N.Y. Admin-

istrative Code § 435-4.0(f) (Supp.1971). As the section has been construed by the New York courts, the burden exists even if there is insufficient evidence for an indictment. It exists even after acquittal or dismissal. It seems plain enough that absent evidence of unlawful conduct, criminal sanctions may not be imposed nor property forfeited even though in the case of property forfeiture the burden of proof on the government seeking it is only by a preponderance of the evidence.

*McClendon*, 460 F.2d at 115 (internal citations omitted). The city thus treated the arrestee as if his property was contraband or was presumptively subject to forfeiture. The court noted the defendant's concession that, as a matter of practice, when a registered owner of a car seized in connection with an arrest filled out a form provided by the Property Clerk, showed proof of ownership and lawful possession, and the District Attorney had released the car as evidence, "the Property Clerk will *frequently* return the automobile if he is satisfied that the claimant had no knowledge it was used as a means of or in furtherance of crime." *McClendon*, 460 F.2d at 115-16 (emphasis in original). The court characterized this regular practice as displaying a "substantial degree of governmental arbitrariness" that "suggests *per se* a lack of due process." 460 F.2d at 115. The court therefore held the municipal code "unconstitutional as applied to persons from whose possession money or property, other than contraband, has been taken or obtained, though such money or property was not related to any criminal proceeding, or, if it was so related, such crim-

inal proceedings had been terminated, or if the money or property had been needed as evidence in a criminal proceeding, it was no longer needed for that purpose, as violative of the due process clauses of the fifth and fourteenth amendments." 460 F.3d at 116.

The case was remanded to the district court, which in turn issued a remedial order specifying a procedure for release of property taken at arrest. Among other things, the district court required the City of New York to provide each person from whom property was taken at arrest a voucher which contained instructions (printed on the back of the voucher) on how to reclaim his or her property. According to the court's order, the arrestee could reclaim property taken at the time of arrest by presenting the voucher, proper identification, and a district attorney's release stating that the property was not needed as evidence, to the Property Clerk. Upon demand, the Property Clerk was then obliged to release the money *or* institute forfeiture or other judicial proceedings if it intended to keep the property further. *See Butler*, 896 F.2d at 701-02 (explaining the procedure set forth by the district court after remand in *McClendon*). The City of New York, however, failed to update its municipal code to reflect the court-ordered procedures but instead left in place the procedures which had been stricken down in *McClendon*. The plaintiff in *Butler* claimed not to have received the voucher containing the instructions for reclaiming his property. Because the City of New York had not yet modified the municipal code to reflect the *McClendon* procedures, and because the police department did not give Butler a voucher

informing him of the prevailing procedures, the court found that Butler could maintain a due process claim based on lack of notice of the procedures to reclaim his property. 896 F.2d at 703-04.

In *Alexandre*, the third case in the series, the plaintiff was arrested, charged with murder and convicted. At the time of his arrest, police officers seized the car he was driving and jewelry in his possession. None of the property taken was related to the crime. *Alexandre*, 140 F.3d at 407. The police ultimately returned the car to the title holder to whom Alexandre owed some remaining payments. The jewelry was misplaced, lost or stolen. Alexandre raised two arguments. First, because the loss of his property resulted from established City procedures and not from a random and unauthorized act, the existence of post-deprivation remedies under state law did not foreclose a due process claim. Second, he contended that, even if established City procedures allowed claimants to recover property in a way that satisfied due process, the description of those procedures in the newly updated municipal code was misleading and did not provide constitutionally adequate notice. 140 F.3d at 409. In expounding on *McClendon*, the *Alexandre* court explained that the earlier municipal code was unconstitutional in two respects. First, prisoners whose property was being held by the Property Clerk did not receive meaningful notice of the procedures for recovering it. And second, the municipal code "improperly placed the burden of proof on the prisoner to 'establish that he ha[d] a lawful title or property right in such property or money and lawfully obtained possession

thereof and that such property or money was held and used in a lawful manner.'" *Alexandre*, 140 F.3d at 409 (quoting the now-obsolete New York municipal code). "This arrangement impermissibly permitted the imposition of criminal sanctions in the absence of unlawful conduct." 140 F.3d at 409 (citing *McClendon*, 460 F.2d at 114-16).

Analyzing Alexandre's due process claims, the court considered the defendant's claim that there could be no due process claim for the release of the car to the title holder because post-deprivation remedies available under state law were adequate to compensate Alexandre for any injury he suffered as a result of the release of the car to the vendor that held title pending final payment. Citing the Supreme Court's reasoning in *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986), and *Hudson v. Palmer*, 468 U.S. 517 (1984), the court noted that pre-deprivation procedures are impracticable in cases of negligent and even intentional deprivations of property when those deprivations occur through random and unauthorized conduct of state employees; a state cannot predict, after all, when that conduct will occur. 140 F.3d at 411. In those cases, adequate post-deprivation remedies will suffice. But an adequate post-deprivation remedy is a defense to a Section 1983 action only where the deprivation is random and unauthorized. *Alexandre*, 140 F.3d at 411; *Butler*, 896 F.2d at 700. "By contrast, 'the existence of independent state relief does not defeat a Section 1983 claim where the deprivation complained of results from the operation of established state proce-

dures.'" *Butler*, 896 F.2d at 700. Because the release of Alexandre's car to the vendor holding the title was effected in accordance with the City's established procedures, the court held that the Section 1983 action was not barred by *Parratt* and *Hudson*. According to the court, the system established by the City allowed the Property Clerk to release a vehicle without notifying the arrestee who held the voucher for it, and created no procedure for an arrestee to challenge the City's action of handing the vehicle over to the titleholder. Such a system did not comport with due process. *Alexandre*, 140 F.3d at 413.

As for the jewelry, the court first noted that twenty-six years had passed since *McClendon* had been decided and the City of New York had still failed to amend its municipal code to eliminate the unconstitutional provisions struck down in *McClendon*. Unlike Butler, though, Alexandre received a property voucher for his jewelry. Copies of the voucher in the record, however, showed only the front of the voucher and it was therefore unclear whether Alexandre had been provided with the instructions for reclaiming property that normally appeared on the back of the voucher. The City had amended the municipal code to include at least part of the court-ordered procedures for the release of property taken at arrest. The court remanded the claim relating to the jewelry so that the trial court could consider in the first instance whether the amended municipal code provided adequate notice of the procedures and whether the procedures themselves, as set forth in the amended code, were adequate to satisfy the requirements of the due process clause. *Alexandre*, 140 F.3d at 414.

The Second Circuit cases help clarify an issue lurking in this case: the difference between regular procedures for the return of property and remedies to pursue if property is not returned according to those regular procedures. The parties argue over whether Section 108 is a "remedy" available to arrestees seeking return of their property. Arrestees should require a post-deprivation "remedy," however, only when random and unauthorized conduct by City officials results in a deprivation of their property. The appropriate question in the first instance is whether the City, having taken the property of arrestees without a warrant and having retained it until the conclusion of criminal proceedings, has a *procedure* for the return of that property that comports with due process. If the City is saying that Section 108 provides the procedure, and the City reads Section 108 to require the arrestees to seek a court order releasing their property (an order the City admittedly will not honor in certain cases), then those procedures may not comport with due process. As in *McClendon*, that procedure improperly places on the arrestee the burden of proof to establish that he had a lawful right to the property. *McClendon* characterized such a burden as imposing a criminal sanction in the absence of criminal conduct.

Even if arrestees could legitimately be required to seek Section 108 orders as a matter of official policy, the City does not follow the letter of Section 108. Recall that the charges against Nelson were dropped. Under Section 108, "[i]f the person arrested is released without a charge being preferred against him all instruments, articles or things seized, other than contraband, shall be

returned to him upon release." The legal meaning of "preferred" is of course different from the colloquial use of the term. To prefer charges means "to bring before; to prosecute; to proceed with." Black's Law Dictionary, Sixth Edition (1990). Under Section 108, when the charges against Nelson were dismissed, his property (excluding any contraband) should have been returned to him without further ado. Section 108-2 does not contemplate a court issuing an order to effectuate the return of property under these circumstances; it simply states the property "shall be returned." Nor does Section 108-2 or Section 108-11 specify that an arrestee is obliged to seek a court order to retrieve property taken at the time of arrest. Section 108-11 provides only that "[t]he court before which the instruments, articles or things are returned shall enter an order providing for their custody pending further proceedings," not that the arrestee must demonstrate an entitlement to such an order or even that he must ask the court to enter such an order. Unless and until the City seeks an order allowing it to continue to hold an arrestee's money following the conclusion of criminal proceedings, or until a court *sua sponte* enters such an order, it would seem that an arrestee is entitled to his money at the conclusion of the criminal case and after the time for forfeiture has expired.[12]

---

[12] In their complaints, both Nelson and Gates take issue with the City's failure promptly to return their property at the conclusion of the criminal proceedings. In the class action count of the complaint, the plaintiffs cite as a common ques-

(continued...)

Moreover, the City did not confine itself to Section 108, instead telling arrestees that they needed a signed Form 54 in addition to other documents in order to retrieve their money. Both Gates and Nelson were told they needed a signed Form 54 when they attempted to reclaim their property. Indeed, the Notice begins with the words "Property Release Order CPD-34.554 Required." The plaintiffs were not told they could present a Section 108 order or an order from an asset forfeiture court in the alternative. Nor was Nelson told that his *Pollard* notice (the one he never received) would have been sufficient to reclaim his money. Whether arresting officers are ever available to sign or willing to sign a Form 54 is a matter of some dispute, as is the question of whether the City requires the Form 54 in narcotics cases. The plaintiffs each tried multiple times without success to obtain the Form 54. There is evidence in the record that officers routinely check the "hold for evidence or investigation" box on the inventory receipt, an action which triggers the need for the Form 54, and

---

[12] (...continued)

tion of law and fact whether the defendants "are required to provide the Plaintiff with a prompt forfeiture hearing or must release the money to the property owner immediately following the final disposition of the criminal charges." R. 192, at 9. And of course, the class is defined to include only persons against whom criminal charges have been resolved in the trial court. We therefore need not decide whether Gates or Nelson or any class members have any right to retrieve their money before criminal proceedings are concluded.

also evidence that some officers (including the officers who arrested Gates) do not know what a "CPD-34.554" is or where these forms are kept. As a routine matter, then, it appears that arrestees are required to seek a Form 54 when arresting officers are unable or unwilling to execute them. As with the Section 108 orders, the arrestees were required to procure a Form 54 even at the conclusion of the criminal cases against them, at a time when the City had no further legitimate claim to the funds. As in the Second Circuit cases, requiring arrestees to obtain a signature from a police officer who may grant or deny it arbitrarily, does not comport with due process. In light of these conflicts in the evidence and deficiencies in the City's legal justifications for shifting the burden to arrestees to demonstrate entitlement to their money at the conclusion of their criminal cases, the district court erred in entering judgment in favor of the City.

A significant amount of money goes unclaimed each year. The amount of money and the number of arrestees who are unable to reclaim their money, construed in a light most favorable to the plaintiffs, are both indications that the City's policy (whatever the fact-finder determines it to be) makes it difficult or impossible for arrestees to reclaim their money even when their criminal cases are concluded. There are a number of open fact questions that would aid the decision of this case. As we asked the City at oral argument, how many arrestees each year "donate" their money to the City and how many reclaim it? What exactly is required of arrestees in order to reclaim their money? If a Section 108

order is required, is it actually available to arrestees, and is it truly a *de minimis* matter to obtain such an order? How many arrestees have their money taken by an officer who checks the "hold for evidence or investigation" box? How many get it back? How many do not? How many Form 54s do Chicago police officers sign each year? How many Section 108 orders are entered, and how many are denied? Given the impressive amount of money that goes unclaimed each year by a class of persons who in all likelihood want it back, has the City created a policy that places an impermissible and daunting burden on arrestees to establish an entitlement to money that the City has no right to retain? Summary judgment on the due process claims was entered in error and we vacate the judgment for proceedings consistent with this opinion.

## C.

Having vacated the judgment related to the due process claims, we turn to the state law restitution claims. On appeal, the plaintiffs complain that the district court erred in dismissing the restitution claims as moot. The restitution claims, which the plaintiffs added in the Fifth Amended Complaint, were brought under theories of unjust enrichment, constructive trust, declaratory judgment and breach of fiduciary duty. Each sought the return of the seized money and nothing more. The City, of course, had tendered the full amount of each plaintiff's claim immediately after the first complaint was filed, long before the plaintiffs filed claims

for restitution and long before they sought certification of a restitution class. Counsel for the plaintiffs returned the City's checks and rejected the tender.

Whether a case is moot is a question of law that we review *de novo*. *Olson v. Brown*, 594 F.3d 577, 580 (7th Cir. 2010), *cert. denied*, 2010 WL 1700880 (June 21, 2010). A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *United States Parole Commission v. Geraghty*, 445 U.S. 388, 396 (1980) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). A tender is sufficient when it makes the plaintiff whole. *Gates I*, 430 F.3d at 431. In this case, the City tendered the full amounts the plaintiffs requested in the restitution counts long before the plaintiffs even added these claims to their complaints. That tender ended any dispute over restitution, and the plaintiffs cannot revive it by simply refusing the tender. *Holstein v. City of Chicago*, 29 F.3d 1145, 1147 (7th Cir. 1994). That plaintiffs sought to certify a restitution class does not change this result because they did not add the claims or move to certify the class until after their personal stake in the action had evaporated. *Holstein*, 29 F.3d at 1147. The facts do not lend themselves to any exception to the general rule, and the district court therefore correctly dismissed the restitution claims as moot.

## III.

In sum, we find that the district court erred in granting summary judgment in favor of the City on the

plaintiffs' due process claims. We therefore vacate the judgment in part and remand for further proceedings on the due process claims relating to notice and procedures to reclaim seized funds. We agree, however, with the district court's assessment of the restitution claims, which were properly dismissed as moot and we therefore affirm the judgment in part. Each party shall bear its own costs on appeal.

AFFIRMED IN PART,
VACATED AND REMANDED IN PART.